## WILLIAMS and others *v.* THEOBALD and others.

*(District Court, D. California. January, 1883.)*

CHARTER-PARTY—DETENTION—LIABILITY OF CHARTERER.

Where the voyage described in the charter-party was a voyage " to San Francisco, or as near thereto as the vessel can safely get," and the cargo was to be delivered "along-side of any craft, steamer, floating depot, wharf, or pier, as may be directed by the consignees," and the consignees named a wharf to which, by reason of its crowded state, the vessel could not enter for a time greater than that within which, by other provisions in the charter-party, the discharge was to be effected after it had been commenced, *held*, that the charterer was liable for the detention.

In Admiralty.

*Milton Andros*, for libelants.

*Edward J. Pringle*, for respondents.

HOFFMAN, J. The libel in this cause was promoted by Thomas Williams and others, owners of the British ship Cambrian Princess, against the charterers of the ship, to recover demurrage consequent on the delay, occasioned by the fault of the latter, in discharging the cargo of the vessel at San Francisco.

By the terms of the charter-party the vessel was to be laden with coals at Sydney, New South Wales, "and being so laden shall therewith proceed to San Francisco, or so near thereto as she can safely get."

Having arrived at San Francisco, the cargo was to be delivered "along-side any craft, steamer, floating depot, wharf, or pier, * * * *as may be directed by the consignees,* to whom written notice is to be given of the vessel being ready to discharge." "The cargo is to be unloaded at the average rate of not less than 100 tons per working day, weather permitting, but, when required by the consignees, such

extra quantity is to be unloaded as may be practicable, etc., *or charterers to pay demurrage at the rate of four-pence per registered ton per diem*, except in case of unavoidable accident or other hindrance beyond charterer's control." These are the only provisions of the charter-party material to this cause.

The bill of lading contained the usual conditions, and in addition thereto the provision, "*and all other conditions as per charter-party*." No consignee of the cargo was named in the bill of lading, but, by the terms thereof, the cargo was to be delivered "*to order*." Previous to the arrival of the ship at San Francisco, which was on the twenty-first day of October, 1881, the cargo had been sold to the San Francisco Gas-light Company, to which the fact of her arrival was announced on that day.

On the twenty-second of October, the day after the arrival of the ship at San Francisco, the written notice required by the charter-party, of the ship's readiness to deliver the cargo, was given by the master to the charterers' agent at this port. The answer admits this fact, and avers "that immediately upon receiving notice from the master that the Cambrian Princess was ready to discharge cargo, the defendant directed the master to deliver the cargo in San Francisco at the wharf of the San Francisco Gas-light Company." The out-turn of the cargo was 1,808 1720-2240 tons, to discharge which, at 100 tons per day, would have taken 19 working days.

The ship was ready to discharge on the twenty-second of October, but, as that day was Saturday, the libelants exclude that day and the following Sunday—not being a working day—from the computation of the lay days, and claim only that they commenced on Monday, October 24th.

From October 24th to November 14th, inclusive of both of said days, there are 22 days, three of which were Sundays, leaving 19 working days, in which the cargo could have been fully discharged.

The discharge of the cargo was commenced on the eighteenth day of November and was finished on the first day of December following, a period of 17 days from and including the fifteenth day of November, two of which were occupied by the ship in taking "stiffening." As these two days would have been used by the ship for the same purpose had the discharge of the cargo been commenced on the twenty-fourth of October, they are excluded from the 17 days, leaving the actual number of days that the ship was on demurrage, 15. For these 15 days the libelants claim demurrage at the rate of four-pence

per ton per day on the registered measurement of the ship—1,350 tons—equal to £22 10s. per day; or, reckoning the pound sterling at $4.86 65-100, $109.50 per day, amounting to $1,642.44.

The charterers admit the fact that the cargo was not discharged as soon as it could have been if the ship had gone to the wharf on the twenty-fourth of October, but they attempt to excuse this delay:

(1) Because at the time the ship was ready to make delivery of the cargo "an unusual and extraordinary number of vessels had arrived at the harbor of San Francisco with cargoes of coal for the said company, and all the wharves owned or leased by said company, and all the wharves near its gas-works, were occupied, and it was impossible to receive the Cambrian Princess at any of said wharves until the eighteenth day of November, 1881." (2) "That the consignee was entitled, under the said charter-party, to a reasonable time to obtain a berth for said ship; that, by the custom of the port of San Francisco, five running days are allowed to the consignee for bringing ship from anchorage to dock before the days allowed by a charter-party for discharging cargo commence." (3) "That said ship was not detained by any neglect or refusal to commence receiving the cargo, as alleged in the seventh article in said libel, but by a hindrance beyond charterer's control."

It appears from the testimony of Mr. Crockett, the superintendent of the gas-light company, that, although the coal could not have been, prior to November 18th, delivered at any wharf south of Market street, it could at any time have been delivered at the sea wall; but, if landed there, the hauling it thence to the company's yards would have cost the company an additional 50 cents per ton.

It appears, also, from his testimony, that the quantity of coals purchased by the gas-light company to arrive and to be delivered on its wharves in the autumn of 1881, as well as the arrival of many coal-laden vessels together, or at about the same time, and to be there unloaded, was exceptional.

It appears to be well settled in England that where, by the charter-party, the ship is to be brought to a particular dock, or as near thereto as she can safely get, and she is prevented from getting to her primary destination by any permanent obstacle other than an accident of navigation, the ship-owner is entitled to damages for the detention by reason of the charterer's refusal to receive the cargo at the alternative place of delivery, although the obstacle which prevented her from getting into the docks (viz., their crowded state) was not an obstacle endangering her safety. *Nelson* v. *Dahl*, 12 L. R. Ch. Div. 568, 583; *Ford* v. *Cotesworth*, L. R. 4 Q. B. 127; *Cross* v. *Beard*, 26 N. Y. 85.

It is also settled that where the contract specifies a certain number of days for loading and unloading, and provides that for any detention beyond the lay days demurrage is to be paid at a fixed rate per day, the shipper is held very strictly to its terms; neither a municipal regulation of the port prohibiting the unloading for a limited period, nor delay occasioned by frost, tempest, or by the crowded state of the docks, will relieve him from the payment of demurrage. *Randall* v. *Lynch*, 2 Camp. 352. But where no particular period for loading or unloading is stipulated in the contract, the freighter is bound to receive the cargo within a reasonable time, and for the breach of his implied contract to that effect he is liable in damages. Thus, where the freighter was allowed "the usual and customary time" to unload the ship in her port of discharge, and the crowded state of the docks delayed the discharge, Lord ELLENSBOROUGH held that, as *the evidence showed that it was usual and customary* in the port of London for ships laden with wines to take their berths in the dock by rotation and to discharge into bonded warehouses, there was no breach of the implied covenant to discharge in the usual and customary time. *Rodgers* v. *Forrester*, 2 Camp. 483.

In a subsequent case, where the charter-party was silent as to the time for unloading, it was held by Sir JAMES MANSFIELD that "the law could only raise an implied promise to do what was usually stipulated for by express covenant, viz., to discharge the ship in the usual and customary time for unloading such a cargo, and that had been rightly held to be the time within which a vessel can be unloaded in her turn, into the bonded warehouses." *Burmester* v. *Hodgson*, 2 Camp. 488.

When there is no undertaking to unload the ship within a specified time, but it is agreed that she shall be discharged "with all possible dispatch," or "with usual dispatch," or "with the customary dispatch of the port," or "within reasonable time," the freighter is bound "to use reasonable diligence to do his part towards the *unloading according to the terms and meaning of the charter-party.*" *Nelson* v. *Dahl*, *ubi supra*, 583.

What is a reasonable compliance with the terms and meaning of the charter-party will depend on the circumstances of the case, and on the usages of the trade in which the vessel is engaged.

In *Rodgers* v. *Forrester* and in *Burmester* v. *Hodgson*, which seem to be the leading cases on this subject, it appeared in evidence that the usual and customary time for discharging cargoes of the kind carried in those cases, was the time within which a vessel could get a

berth by rotation, and the wines could be discharged into the bonded warehouses.

In the present case no question arises, such as that presented in *Nelson* v. *Dahl*, as to whether the vessel was "an arrived vessel" before entering a particular dock designated in the charter-party. The terminus of the voyage mentioned in the charter-party is the port "of San Francisco, or as near thereto as she can safely get." She had undoubtedly arrived at San Francisco. No specified number of lay days, at the expiration of which demurrage is to run, is mentioned. The average rate at which the cargo is to be discharged is stipulated for, and the failure of the charterers to discharge at that rate renders them liable to a specified demurrage *per diem*, "except in case of unavoidable accident, or other hindrance beyond charterers' control." But this stipulation must, I think, be taken to apply merely to the rate at which the cargo shall be discharged when the discharge has been commenced. The present suit is for damages in the nature of demurrage for failure to designate a wharf where the discharge could be commenced. By the terms of the charter-party, the cargo, on arrival of the vessel at San Francisco, is to be delivered "along-side any craft, steamer, floating depot, wharf, or pier, * * * as may be directed by the consignees, to whom written notice is to be given of the vessel being ready to discharge;" and the only question in this case is whether the consignees, for their own convenience and profit, had a right to designate a wharf at which they well knew the discharge could not be commenced until after a considerable detention of the vessel.

In the case of *Nelson* v. *Dahl*, so often cited, JAMES, L. J., by way of illustration, supposes the case of a vessel to be discharged at a dock to be named by the charterer, and observes: "Now, could it be reasonably held that under such a charter-party as that the charterer could select and name a dock which he knew would not admit the ship for months, and so compel the ship to remain as a floating warehouse for him during those months?"

The case of *Davis* v. *Wallace*, 3 Cliff. 123, closely resembles the case at bar. The vessel was detained at the wharf designated by the charterer four days,—three because the berth was occupied, and one by lack of teams. The charterer was held liable for the detention. But the charter-party in that case provided for "*quick dispatch*" at the port of delivery; and this contract, it was held, "overrides any customary mode of discharging vessels by which they are to take their turn at the wharf. The naming of a wharf is a warranty that

a berth can be had there." *Thacher* v. *Boston Gas-light Co.* 2 Low. 362; *Keene* v. *Audenreid*, 5 Ben. 535; *Bjorquist* v. *Steel Rails*, 3 FED. REP. 717.

In *Dahl* v. *Nelson*, 6 L. R. App. Cas. 44, Lord BLACKBURN said: "If the charter-party had left it free for the merchant to select a dock, it may well be that he was bound to select one into which admittance could be procured." *Ogden* v. *Graham*, 1 Best & S. 773, is an authority for this position. But the case of *Ogden* v. *Graham*, to which his lordship refers, merely decides that where the vessel is to proceed to a "*safe port*" of discharge to be named by the charterer's agent, and the latter named a port closed by the order of the Chilian government, and to which the ship could not proceed without confiscation, and the ship was in consequence detained for some time at Valparaiso, after which, the port being opened, she proceeded thither and discharged her cargo, the charterer was liable for the detention.

In *Cross* v. *Beard*, 26 N. Y. 85, it was held that in the absence of express agreement a contract is implied that the consignee of goods will provide for discharging them within a reasonable time, to be judged of by the jury under all the circumstances; and that the refusal to admit evidence tending to show that it was in no respect his fault that there was a delay in loading or unloading the vessel, was error. But in this case there was no stipulation as to the time to be allowed for discharging the cargo, and the right of the respondent to receive it at his own wharf was conceded. It will also be noted that the court, though holding that evidence showing that the delay in providing a berth for the ship was owing to a break in the Erie canal and a storm on the lake was admissible, yet forbears to say that these facts would necessarily constitute a defense. "Whether," it says, "the defendant should be considered in fault in not providing means for unloading a greater number of vessels at one time, or whether under the actual circumstances he ought to have engaged another wharf to receive the coals, were questions for the jury to determine."

In *Esseltyne* v. *Elmore*, 7 Biss. 69, the general principle was recognized that in the absence of express stipulation it is the duty of the consignees to furnish, within a reasonable time after the arrival of the vessel was reported to them, a suitable place for her discharge, and also to complete it within a reasonable time; and that the fact that a considerable number of vessels, consigned to the defendants, had arrived with cargoes about the same time, and there was delay in consequence in assigning her a berth, was a circumstance for which

the ship-owner was not responsible. "It was a risk which the defendants themselves took when they agreed to freight the schooner."

It is, perhaps, not easy to reconcile these cases, but it ought to be observed (1) that the New York case does not decide that the defendant's inability to furnish a berth, by reason of the crowded state of the docks in consequence of a storm, is an absolute excuse for the detention, but only that evidence of that fact may be given to the jury, leaving them to judge whether, under all the circumstances, he ought not to have provided additional means or furnish another wharf; (2) that the authorities chiefly relied on are the cases of *Rodgers* v. *Forrester* and *Burmester* v. *Hodgson,* already cited in this opinion, within the reasons of which the case under consideration by the court was supposed to fall. But we have seen that in each of those cases it was proved that the customary time for discharge in the port of London, of the cargoes in question, was the time within which the vessel "could obtain a berth by rotation, and the cargo be discharged into bonded warehouses." No such proof was offered in that case or in the case at bar, and if it had been in the latter, it would probably not have materially altered the case.

If, then, the implied stipulation, where no specific time for discharge is mentioned, is that it shall be effected within a reasonable time, it appears to me that the case in Bissell lays down the more reasonable doctrine, and that the consequences of the inability of the consignee to furnish a place where the discharge can be effected within such reasonable time ought not to fall upon the vessel.

Although the charter-party in the present case does not specify a certain number of lay days, at the expiration of which demurrage is to run, it indicates the rate at which the discharge, when commenced, shall be effected. The cargo is to be unloaded at the average rate of not less than 100 tons per day, weather permitting, or charterers to pay demurrage at the rate of four-pence per "registered ton *per diem,* except in case of unavoidable accident or other hindrance beyond charterer's control."

As the discharge, when commenced, was not interrupted by any accident or hindrance whatever, but was conducted with dispatch, this clause may be left out of consideration. *Thatcher* v. *Boston Gaslight Co.* 2 Low. 363.

The cargo actually delivered at San Francisco was 1,808 tons. Dividing this by 100, the least number of tons to be secured daily, and we have 19 working days for the period within which the cargo

was to be discharged; and this period is fixed with as much certainty as though 19 working days had been originally written in the charter-party as the number of lay days. *Sanguenette* v. *P. S. Nav. Co.* L. R. 2 Q. B. Div. 238.

The vessel was reported ready to discharge on the twenty-second of October. It is only claimed, however, that the lay days began to run on the 24th.

The discharge was not commenced until November 18th, and was finished on December 1st. Excluding the Sundays which intervened between October 24th and November 18th, the vessel was thus detained for a period greater by several days than the whole time allowed by the charter-party for her discharge.

It has already been observed that there is no evidence to show that by the customs of the port or the usages of this particular trade vessels are required to await their turn to unload at the dock which may be specified in the charter-party or designated by the consignee, so as to bring this case within the reasons of the *nisi prius* cases reported in 2 Campbell. If such usage had been shown, and a particular dock had been mentioned in the charter-party, a reasonable detention while awaiting a berth might be deemed within the contemplation of both parties, but not even then, as we have seen, any permanent or protracted detention. *Nelson* v. *Dahl, ubi supra.* But in this charter not only is no particular dock mentioned, but the vessel is required to discharge "along-side any craft, steamer, floating depot, wharf, or pier, as may be directed by the consignees." It may, perhaps, be doubted whether it was contemplated by either of the parties that a dock might be selected by the consignees into which, by the usage of the port, (if such usage had been shown,) vessels could only enter in their turn. If a usage had in fact existed requiring Australian coal vessels to discharge in their turn at particular wharves, the parties do not seem to have contracted with reference to it, for the charterer reserved the right to designate "any craft, steamer, floating depot, wharf, or pier" he might select. Some reliance is placed on a regulation of the Merchants' Exchange of San Francisco, to the effect that for vessels with coal from the Atlantic or Australian ports the lay days shall commence five running days after arrival, providing that discharging berth can be procured. But there is no proof that this regulation was known to the parties, or that they acted with reference to it, nor that it is or has been acted on by any one. Its mere existence, perhaps as a dead letter, is

clearly insufficient to prove a usage in conformity to it. 10 B. & C. 770. Even if it were allowed as fixing the time when the lay days began, viz., five days after the vessel's arrival, it would only make a difference of three days. The vessel arrived October 21st. The libelants only claim that the lay days began to run on the 24th. If, by a well-established and generally-recognized custom of the port, the charterers in this trade were allowed a certain number of days to find a berth for the vessel, (e. g., three days, as in New York,) the lay days would be reckoned (in the absence of a special contract) from their expiration. But no such usage is shown, and the detention was not caused by the consignee's inability to procure a berth, but by this selection of a dock where he well knew that no berth could be obtained.

It seems to me that the fair and reasonable interpretation of the contract is that the charterer was, unless in case of unavoidable accident or other hindrance beyond his control, to receive the cargo at the rate per working day mentioned, and therefore within the time thereby indicated, and that he had no more right to select a wharf at which the discharge could not be commenced until the twenty-seventh day after the vessel's arrival, than he had to designate a "craft, steamer, or floating depot" which would not be ready to receive the cargo until after a similar delay, or which had not the capacity to take on board the number of tons per day agreed to be received; and for the detention caused by this selection he is liable.

We have already seen if the charter-party had contained a provision for "quick dispatch," "the utmost possible dispatch," or the like, any custom of the port by which vessels in the trade are required to discharge at particular docks, and to await their turn for a berth, would be overridden by the express agreement of the parties.

In the entire absence of proof of any such custom, and in presence of the stipulation fixing the rate at which the discharge should be effected, I think that, even under a provision for "customary dispatch," the delay in commencing the discharge in this case would, in view of its duration and its causes, have been wholly unjustifiable. The libelants claim that the vessel was detained 15 days. I think she was, in fact, detained for at least that number of days. The demurrage agreed upon for the detention of the ship by reason of the charterer's failure to discharge at the rate per diem specified in the charter-party would seem to afford a prima facie rule of damages for delay in commencing the discharge.

It is suggested that this is not, in fact, an accurate measure of the damages actually sustained. A reference will therefore be had to the commissioner to take testimony and report the actual damages sustained by the 15-days' detention.