## FLOOD et al. v. CROWELL.

### (Circuit Court of Appeals, Fifth Circuit. January 24, 1899.)

### No. 730.

SHIPPING—DEMURRAGE FOR DETENTION OF VESSEL—CONSTRUCTION OF CHARTER
PARTY.

A charter party fixed the demurrage for each day's detention of the
vessel "by the default" of the charterers or their consignees. It made no
provision for "dispatch" or "quick dispatch" in loading or discharging the
cargo, but fixed the minimum amount to be loaded or discharged each
day, and provided that the lay days should commence "from the time
the captain reports himself ready to receive or discharge cargo." *Held*,
that under the latter provision the lay days did not commence until the
vessel was ready and in position to receive or discharge cargo, and that
the contract did not bind the charterers for demurrage for a delay of the
vessel in obtaining a wharf at which to discharge, notwithstanding a
notice of readiness to discharge from the captain, where, as the owners
knew or should have known, all the wharves at the port of destination
were public, and under the exclusive control of a harbor master, who
directed the movements and position of all vessels thereat, and by the
rules of the port each vessel was required to wait her turn.[1]

Appeal from the District Court of the United States for the Eastern
District of Texas.

The libel was filed December 2, 1896, alleging that the schooner Horace W.
Macomber in October, 1896, at Newport News, took on board 1,600 tons of
coal, to be delivered at Galveston, Tex., to respondents, Flood & McRae, under
a charter party duly signed, stipulating for a discharge of 250 tons of coal
per day, and for $90 per day for every day's detention; that on the 4th day
of November, 1896, at 9 o'clock a. m., the master of the schooner notified Flood
& McRae of arrival and readiness to discharge, and that on said day Flood &
McRae directed the captain of the schooner to report to the harbor master
for a berth, and that the harbor master told him there was none at the wharf,
and that he would have to lie alongside the schooner Swann, which he did
until November 8, 1896, when the Swann sailed, and the Horace W. Macomber
took her place at the wharf; that his cargo was not discharged until noon of
November 16, 1896. Libelant alleged that, by the terms of the charter party,
6 2/5 days from the notice of readiness to discharge were allowed, and that
they terminated at noon on November 11, 1896, wherefore he is entitled to
5 days' demurrage, at $90 per day. The respondents filed an answer and an
amended answer, and denied that the vessel arrived on the 3d of November,
1896, and that she was ready to discharge on that date. They denied that
they accepted the said cargo on November 4, 1896. They alleged that the
vessel was discharged within the time contemplated by the terms of the
contract, and therefore no demurrage was due. Answering further, respond-
ents alleged that the master of the Macomber did give notice of his arrival
on the 4th of November, 1896, but that in truth and fact he had not arrived,
for that he was neither able nor ready to discharge; that his vessel got
aground after his notification; that they had no control of any wharf of the
city, but that the harbor master had absolute and entire control of the
wharves, and that they notified him that they did not and would not accept
his notice of arrival until he was berthed alongside the wharf and ready to
discharge; and that they were ready at all times to receive the cargo when-
ever he was ready to deliver it to them, but were prevented from doing so
because of the inability of the master of said vessel to deliver it to them. The
respondents further answered that the libelant had frequent dealings with
the port of Galveston, and had frequently contracted concerning the charter-
ing of his vessel with respect to the port of Galveston, and that he knew at

[1] On question of demurrage, see note to Randall v. Sprague, 21 C. C. A. 337.

the time of making said charter that the vessel would be subject to the regulations of said port, and that it should take all the risks of delay incident to the harbor municipal regulations of the city of Galveston. They also alleged that the ordinances of the city of Galveston and the regulations of the port were part of the contract between the libelant and respondents, and by an ordinance of said city Flood & McRae had no power to provide any berth at the wharves, but that the same was entirely under the control of the harbor master. The amended answer set out in full the ordinance of the city, which provides that the harbor master shall have power to regulate and station all ships and other vessels at the wharves, and to move any and all ships from one place to another, in his discretion, and gives said harbor master the power to remove such vessels himself, in case of refusal of the master, and making such refusal to obey the harbor master a misdemeanor, punishable by fine and imprisonment, and providing for recovery of all expenses incurred by such refusal of the master of any vessel at the port of Galveston. The respondents further alleged the custom of the port that the harbor master shall place the vessel according to his discretion, and that, as soon as the harbor master did place the Horace W. Macomber, respondents immediately unloaded said cargo at a greater rate than 250 tons per day, as specified by the charter party, and received her cargo within a shorter time than was allowed by its terms; that they had no power to get a berth for said vessel, which was known to the owners of said vessel, and actually known to the master of said vessel; and that such was not the custom of the port.

The libelant introduced a charter party signed September 22, 1896, by Samuel R. Crowell, for the vessel, and the Chesapeake & Ohio Coal Agency, charterers, of which the following are the parts bearing upon the case: "The said party of the second part doth engage to provide and furnish to the said vessel, at Newport News, a full and complete cargo of coal, and pay to said party of the first part, or agent, for the use of said vessel during the voyage aforesaid, ($1.65) one dollar and sixty-five cents per ton of 2,240 pounds, delivered; freight payable on proper discharge of cargo, free of discount or commissions. It is agreed that the lay days for loading and discharging shall be as follows, commencing from the time the captain reports himself ready to receive or discharge cargo: Time for loading and to be discharged, rate of not less than (250) two hundred and fifty tons per day, Sundays excepted. Consignees to discharge cargo at 27½ cents per ton of 2,240 pounds. And that for each and every day's detention by default of said party of the second part, or agent, ($90) ninety dollars per day, day by day, shall be paid by said party of the second part, or agent, to said party of the first part, or agent. The cargo or cargoes to be received and delivered alongside, within reach of vessel's tackle. The dangers of the seas mutually excepted. It is also agreed and understood vessel is now at Boston, and is to proceed direct to Newport News, to enter on this charter."

Edwin Bray, master, testified by deposition: That the Horace W. Macomber arrived at Galveston, Tex., November 3d, at 6 p. m. That he notified Flood & McRae that she was in port, and ready to discharge, Wednesday, November 4th, at 9 a. m., and that they instructed him to notify the harbor master for a berth to discharge. He saw the harbor master about 10 a. m. the same day, and learned that there was no berth for discharging, and was ordered to haul alongside the schooner William H. Swann. That he hauled alongside said schooner at 11:30, November 5th. His vessel got aground, but he said she would not have gotten aground, if she had gotten a berth when Flood & McRae were notified. The consignees notified him when he reported his arrival that they had no control of any wharf, but that the city, through its harbor master, had absolute and entire control of the wharves and all berths for vessels; but he insisted on the terms of the charter party,—250 tons per day from the time of reporting that the vessel was ready to discharge. Flood & McRae began taking cargo as soon as the vessel was berthed, but he said they did not furnish enough drays to keep the vessel working her full capacity for delivery according to charter party. E. O. Flood, of the firm of Flood & McRae, testified that he (his firm) had chartered three vessels from the owners of the Macomber before this charter, and produced a book entitled "Port Charges of the World,"—a standard work, and

one in general use,—which contained the ordinance relating to the exclusive power of the harbor master over berthing of vessels in the port of Galveston. This was agreed to by counsel as an ordinance of the city of Galveston now in force, and at the time of the arrival of the Macomber. The vessel was brought in by the pilot on November 4th, at 4:30 p. m., and entered in the custom house on November 4th. The captain gave verbal notice of arrival on the morning of the 5th, whereupon witness denied that he had arrived until he got into a position to discharge. He was not then ready to discharge. On the day of his arrival he got aground, and did not get his vessel off until about 1 o'clock p. m. the following day, November 5th. He was in no position to discharge until then, even if a berth had been open to him. There was no berth open for him at that time in the city. They were all occupied by other vessels. Respondents hastened the discharge of the Swann in order to get the Macomber a berth. Upon Flood & McRae notifying the master of the necessity of applying to the harbor master, he did so, and did not demur. The harbor master instructed him to place his vessel alongside the William H. Swann. It is the custom of the port of Galveston for the harbor master to get vessels' berths in their turn, and the consignee must accept the vessel without regard to what pier she may be placed by the harbor master. On Sunday, November 8th, a berth became vacant, and she took position alongside the dock. On Monday, November 9th, at 7 a. m., he began discharging at the earliest moment possible. If demurrage were calculated from the time she got off the ground, it would be $311.25. The vessel went aground because a norther had sprung up. Flood & McRae finished discharging at 10 a. m., November 16th. Capt. John E. Chubb, harbor master, testified that there was no open berth for the Macomber, with water sufficient for her. He is the only person vested with the power to regulate the shipping in this harbor, and no one had power to designate a place for the Macomber without his consent. The custom of the port is to place vessels in berths in their order as they arrive. If all the available berths are occupied, and a coal vessel arrives, she would be outside of another vessel, and wait till the other vessel discharged. He acts under the ordinances of the city of Galveston, which vest him with the power to regulate the shipping,—to designate berths for vessels upon arrival, which must report to the harbor master for berths.

The district court gave a decree for the libelant for $333.35 demurrage, and Flood & McRae sued out this appeal. The record shows that counsel for libelant below (appellee here) filed a cross assignment of errors in the court below, but the record shows no other steps taken which would perfect a cross appeal.

John C. Walker, for appellants.
W. B. Denson, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and PARLANGE, District Judge.

PARDEE, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

This is a suit brought by the owners of the ship Horace W. Macomber for demurrage under a charter party which provided that, for each and every day's detention by default of the consignees, they should pay owners $90 per day. The demurrage claimed is for the delay between the ship's arrival at the port of Galveston and the securing of a wharf for discharge, and the narrow question is whether the consignees are in default for such delay. The charter party provides that "lay days for loading and discharging shall be as follows, commencing from the time the captain reports himself ready to receive or discharge cargo: Time for loading and to be discharged, rate of not less than two hun-

dred and fifty tons per day, Sundays excepted,"—and also provides
that "the cargo or cargoes shall be received and delivered alongside,
within reach of vessel's tackle." We do not find in the charter party
any express provision that the consignees shall select, furnish, or pro-
vide a wharf for the ship to discharge, nor any provision guarantying
"dispatch," "quick dispatch," or that the lay days shall commence on
arrival of the ship, from which can be implied a contract to furnish a
wharf for discharge. The provision that "the lay days shall com-
mence from the time the captain reports himself ready to receive or
discharge cargo" means no more than that the lay days shall com-
mence from the time the ship is ready to discharge cargo, within the
meaning of the charter party; and the provision that "the ship is to
be discharged by the consignees at a rate of not less than two hun-
dred and fifty tons per day" means no more than that the consignees
shall discharge the ship at that rate after the ship is ready to be dis-
charged. The ordinances regulating the assignment of ships to
wharves in the port of Galveston for loading and unloading, and the
custom prevailing in the port of Galveston, requiring, when the
wharves are all occupied, that ships shall be assigned in their turn,
were, or should have been, known to the owners of the ship, who, it
appears, had sent previous cargoes, under charter parties similar to
the present one, to the port of Galveston; and they did know, or
should have known, that all the wharves in Galveston were public,
and could not be controlled by consignees. Being charged with this
knowledge, if the owners desired to make consignees liable for de-
lays in obtaining a wharf, and relieve themselves from delays of the
kind, they could and should have provided for the same in their
contract. Having failed to make such provision, and the consignees
not being bound, under our construction of the charter party, to im-
mediately furnish the ship a wharf at which she could discharge with-
out delay, we cannot find that for the delay in this case the consignees
were in any wise in default. If not in default, they were not liable
for demurrage. We have examined the many cases cited by counsel
for appellee as supporting his contention as to the liability of the con-
signees, and, while in many of them detached expressions can be found
which appear to support the contention, we do not find any of them to
be in conflict with the construction we have given to the present
charter party. The other cases we have examined, mainly cited by
counsel for appellants, are to the effect that, where there is no ex-
press contract on the part of the consignees to furnish a wharf, yet,
where the consignees have contracted for dispatch in discharge, or for
quick dispatch, or that the number of lay days shall commence on the
arrival of the ship in port, there results an implied contract that the
consignees shall be responsible for the delays occasioned by failure to
promptly secure a wharf for loading or discharging. In these decisions
we mainly concur, but they cannot be applied to any advantage in the
instant case. As the proof in this present case shows that, when the
vessel obtained a wharf and was ready to discharge, the consignees
discharged and received the goods as rapidly as the contract called
for, we are of opinion that they fully complied with the charter party,
were not in default, and cannot be held liable for demurrage. The

decree of the district court is reversed, and the cause remanded to the district court, with instructions to set aside the decree appealed from and dismiss the libel.