HAGAR et al. v. ELMSLIE.

(Circuit Court of Appeals, Third Circuit. March 4, 1901.)

No. 34.

1. SHIPPING—DEMURRAGE—DELAY DUE TO NEGLIGENCE OF CHARTERERS.

Where charterers neglected to advise their agents at the port of destination of their agreement to attend to the entering of the ship at the custom house upon her arrival, by reason of which such agents refused to act, and a delay of three days was caused in having the ship entered,

the owners were entitled to include such days in the lay days allowed by the charter for discharging.

**2. SAME—SUIT FOR DEMURRAGE—DEFENSES.**

A provision of a charter allowing the charterer a certain number of lay days for loading and discharging, and requiring the payment of demurrage for any additional time taken, is an absolute and unconditional engagement on the part of the charterer, who cannot be relieved therefrom except on the ground that the delay was due to the fault or negligence of the owner, or those for whom he is responsible; and such fault or negligence is an affirmative defense in a suit to recover the stipulated demurrage, the burden of pleading and proving which rests upon the charterer.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Horace L. Cheyney, for appellants.

J. Rodman Paul, for appellee.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

GRAY, Circuit Judge. This is an appeal from the district court of the United States for the Eastern district of Pennsylvania in a cause of contract, civil and maritime. 101 Fed. 840. The action arose out of a charter party of the bark Banklands, of which the appellee was the managing owner, and the appellants were the charterers, for a voyage from Philadelphia and New York to Rio de Janeiro. Under that charter party the vessel loaded a general cargo, consisting of locomotives, car materials, case oil, resin, lumber, etc. The provisions relevant to the present case are the following:

"It is agreed that the lay days shall be as follows (if not sooner dispatched), commencing from the time the vessel is ready to receive cargo: 65 running days, Sundays excepted, for loading and discharging; * * * and that for each and every day's detention by default of the said [charterers] or agent $65.85 United States gold dollars per day, day by day, shall be paid by said [charterers] or agent. * * * The cargo to be received and delivered alongside, within reach of the vessel's tackle, free of lighterage to vessel." "Vessel to be consigned to charterers' agents at Rio free of commission for doing the vessel's inward business."

The claim of the libelants embraced the following three items: (1) Customs agency fee at Rio; (2) lighterage of cargo at Rio; (3) demurrage there incurred. In regard to the first two items, the court below said:

"The charge for lighterage is admitted, and need not be further considered. A credit, however, must be allowed thereon for the money received by the master as a present from the owner of the lighters. The item for commission is too large. The sum paid to the broker by the master was for doing all the ship's business at Rio, and not merely for doing her inward business. The respondents were only liable for one-half of this item."

As the judge, in our opinion, was clearly right in the disposition made of these items, they need not further occupy our attention. The principal question is that arising out of the claim for demurrage. In addition to the provision as to lay days and demurrage, already quoted from the charter party, which was dated December 28, 1894, a subsequent agreement as to the same matters was en-

tered into between the parties by the following letter from the appellants to the appellee's agent in New York, dated January 5, 1895, the date at which the charter party was signed:

"We sign inclosed c/p with understanding that the clause, 'General average, if any, to be settled according to York-Antwerp rules of 1890,' not binding in case shippers object to it. Also for discharging at Rio as agreed by captain regarding the days for car material and locomotives, viz. he to serve notice on each lot, and lay days to count as one lot.

Viz. 35 days locos. } to count as 35."
6 to 10   "   car.   }

On February 18, 1895, a second agreement was made by the shippers with the master of the Banklands in writing, as follows:

"We refer to your charter party, dated December 28th, 1894, in which it is stipulated that your vessel is to be loaded and discharged in sixty-five running days, Sundays excepted; and in consideration of your having indorsed on bills of lading a clause allowing the consignees thirty running days, Sundays excepted, with a letter allowing five more, if required, for discharging the locomotives, and six like days for discharging car material,—in all, forty-one days for these two lots of goods,—I agree that if the number of lay days left after completion of loading, over and above the forty-one, be not sufficient to discharge the other cargo, I will pay demurrage here as per charter party for any and all days used over and above the sixty-five days stipulated in charter."

On February 19, 1895, when the vessel was loaded, it was further agreed between the shipper and master as follows:

"We agree that twenty-three running days (23) have been used in loading Br. Bk. Banklands under charter dated December 28th, 1894, leaving forty-two (42) running days, Sundays excepted, for discharging the vessel at Rio de Janeiro."

In discussing these various stipulations, the learned judge of the court below says:

"But the parties have treated the agreement of January 5th, concerning notice, as modifying the apparently contradictory agreement of February 18th, so as to allow for discharge of the locomotives and car material 35 days instead of 41. Accepting this construction, the final result appears to be that the ship would have at least 7 days to unload the general cargo, and might have more. In fact, she had 5 days more, making 12 in all; for the consignees of the locomotives, who were themselves to unload this part of the cargo, used only 30 days in so doing. The single question, therefore, to be considered, is whether the libelants' claim for an additional 13 days should be allowed. Only 8 of these days were actually occupied in unloading cargo, the charge for the remaining 5 arising under the following circumstances: The ship arrived at Rio on Saturday, March 23d, and on the morning of that day the master called upon the respondents' agents, in order to have his inward customs business attended to. This visit was in accordance with instructions received from the respondents before the ship sailed from New York, but by some oversight the agents had not been notified of the instructions, and declined to act. They recommended the captain to apply to another firm of brokers, to whom he had also received a letter of introduction from the respondents. At the office of this firm he found that the principal was absent, and could not be seen before Tuesday; Monday being a holiday, when no business would be done. On Tuesday the firm refused to enter the vessel, and the captain thereupon employed another broker, who finally undertook the ship's business. The vessel was entered at the custom house on the same day, and the next two days were employed by the master in making arrangements to unload the vessel by lighters; this course being necessary, owing to the regulations of the port that were then in force. On Wednesday the consignees of the general cargo were notified that the ship was prepared to deliver, but, as such consignees are allowed from one to two days' notice by the

custom of the port, actual delivery could not be begun before March 29th. These 5 days—March 23d to 28th, inclusive, Sunday excepted—form part of the libelant's claim. I think 3 of them should be allowed. The respondents were at fault for failing to notify their agents at Rio of the instructions communicated to the captain at New York. If such instructions had been given, no reason is apparent why the ship could not have been entered on Saturday, and every arrangement made to begin discharging on Tuesday. The lay days would then have begun on Tuesday, March 26th, and I think they should now be counted from that date."

Agreeing with the learned judge in the view thus stated by him, we have only to consider the remaining question as to the allowance of the eight additional days for demurrage. As to these his opinion is as follows:

"Upon this point, I think the respondents are required to prove that these days were not reasonably necessary to discharge the general cargo, taking into account the conditions of the port, the facilities for doing the work, the quality of labor available, the manner in which the cargo was stowed, and the difficulties in getting at the merchandise in the hold. Without reviewing the facts, it is enough to say that I have come to the conclusion that the time occupied by the ship was not unreasonable, and that these eight days also constitute a proper claim."

This brings to our attention the single question of law raised in this case, and that is whether the burden rested upon the appellants to prove that the delay of eight days in unloading the ship at Rio, over and above the lay days stipulated for in the charter party and subsidiary contracts, was due to any negligence or default of the shipowner, or those for whom he is responsible,—in this case, the master, officers, and crew of the ship. It is universally held that a stipulation in a contract prescribing a time within which an act or thing is to be done or performed by one of the parties thereto, made in unqualified terms (time being of its essence), is absolute in its obligation, and cannot be excused or avoided by the party bound, by reason of any obstacle or impediment to performance, no matter how beyond the control of such party the existence of such obstacle or impediment may be. The one who makes such an absolute and unqualified stipulation must stand the consequences of his voluntary act, and he will be held by the law of the contract to a strict observance of its terms, even if it becomes impossible of performance from any other cause than that of the conduct of the other party to the contract. It is manifest that, if the default or negligence of the other party to the contract prevent or interfere with the performance, the obligation to such party is dissolved, but no matter or thing for which such other party is not responsible can work such dissolution. This is the common law as to contracts generally, and it has been laid down "as firmly established, both by decided cases and on principle, that when a party has either expressly or impliedly undertaken, without any qualification, to do anything, and does not do it, he must make compensation in damages, though the performance was rendered impracticable by some unforeseen cause over which he had no control." Ford v. Cotesworth, L. R. 4 Q. B. 134; Leake, Cont. 693. In charter parties and contracts of affreightment the doctrine here stated is fully recognized. Thus, in Scrutton, Charter Parties, § 23, it is said:

"If by the terms of the charter the charterer has agreed to load or unload within a fixed period of time, that is an absolute and unconditional engagement, for the nonperformance of which he is answerable, whatever be the nature of the impediments which prevent him from performing it, unless such impediments are covered by exceptions in the charter or arise from the shipowner's default. Thus, after the ship is ready to load or to unload, the charterer will not, in the absence of express exceptions, be released from his contract by delay resulting from the crowded state of the docks, bad weather, or ice preventing loading, insufficient supply of cargo, or lawful orders of the authorities at a foreign port."

That the author correctly states the result of the authorities will be apparent by a reference to the cases referred to by the appellee: Davis v. Pendergast, 16 Blatchf. 565, Fed. Cas. No. 3,647; Burrill v. Crossman, 16 C. C. A. 381, 69 Fed. 747; 1,600 Tons of Nitrate of Soda v. McLeod, 10 C. C. A. 115, 61 Fed. 849; Snow v. 350 Tons of Mahogany (D. C.) 46 Fed. 129.

We do not understand the counsel for the appellants to dispute the law in this respect, but they contend that, where it is alleged that the delay was caused by the ship or the master, the burden of proof in this respect is not cast upon the charterer. It must, however, be held that where a stipulation, without qualification, condition, or exception stated therein, is in question, and an excuse for performance recognized by law, though not stated in terms in the contract itself, is relied upon, it must be pleaded in some form, and, as an affirmative plea, must be proved by the party offering it. The philosophy of all systems of pleading requires this. Such an excuse is not by implication embodied in the terms of the contract, as a limitation thereto, and, indeed, could not be, as it goes to the destruction of the contractual obligation. If the onus probandi is not upon such a party, upon whom does it rest? Certainly it ought not to rest upon the party in whose favor an absolute contract is made, containing no exception or qualification, and who has proved that the terms of the contract as written have been broken. In the case in hand the time stipulation for loading and unloading is explicit and unqualified. A number of days allowed for performing the work was absolutely fixed by the agreement of parties. The proof offered by the libelant as to the number of days occupied, over and above the number stipulated for, is clear and uncontradicted, and he is not required to go further. The single excuse available in law, arising from the conduct of those for whom the other parties to the contract are responsible, must be pleaded, and, of course, proved. The court was clearly right in its determination in this regard.

As to the findings of fact by the court below in regard to this plea, we are disposed to accept the same, unless very strong reasons are shown for our not doing so. A careful examination of the testimony on both sides has not convinced us that the court below was wrong in its finding. The testimony offered by the respondents below (the appellants here) was principally that of stevedores in Philadelphia and New York, who were of the opinion that the ship could have been unloaded at Rio Janeiro in less time than was actually taken in doing so. They were not, however, familiar with

the conditions existing in the harbor of Rio, or with any of the surroundings that admittedly might affect the progress of the work of unloading. Their testimony was in the nature of that of experts not fully qualified to testify in the particular case. So, also, as to the testimony of the captain of a ship, who had had experience in unloading in the port of Rio; while better qualified to speak, he still confined his testimony carefully to what could be done on his own ship and with his own crew. It is entitled to some weight, but it is not conclusive, even taken in connection with the other evidence in the case, such as the disparity in the number of barrels of resin, or of cases of chairs, unloaded on different days; the ship's log showing, for instance, 222 barrels one day, and only 54 the next, etc. While, in our opinion, the weight of testimony on either side was closely balanced, the effect of it is not such as to constrain us to reverse the findings of fact made by the learned judge of the court below. The decree of the court below is affirmed.