NEW RUPERRA S. S. CO. v. 2,000 TONS OF COAL.

(District Court, D. Massachusetts. July 20, 1903.)

No. 1,399.

1. SHIPPING—CONSTRUCTION OF CHARTER PARTY—TIME FOR DISCHARGING.
   A provision of a charter party that lay days for unloading shall commence "when steamer is ready to unload and written notice given, whether in berth or not," must be given effect; and delay in waiting for a berth is chargeable against the charterer, although the lay days do not commence merely by notice given of the steamer's arrival in port, but only when she is actually ready to unload, so far as she can be made so by those in charge.

2. SAME—EXCEPTION IN CASE OF STRIKES.
   A delay in obtaining a berth at a port because of the large number of vessels unloading coal brought from foreign countries, owing to a domestic shortage caused by a strike of miners, was not caused by strikes, within an exception in the charter party.

3. SAME—CAUSES BEYOND CHARTERER'S CONTROL—WAITING TURN AT DOCK.
   Where a charter party required the vessel to be discharged at a fixed rate after she was ready to unload, whether in berth or not, a provision that, "in case of strikes, * * * or any other causes or accidents beyond the control of the consignees, which prevent or delay the discharging, such time is not to count," does not exempt the charterer from liability for delay caused by the vessel waiting her turn.

In Admiralty. Suit for demurrage.

Carver & Blodgett, for libelant.

Tower, Talbot & Hiler, for claimant.

LOWELL, District Judge. The steamer Roath, carrying about 5,400 tons of coal, was chartered in Cardiff October 1, 1902. She sailed in cargo from Wales November 2d, and arrived at Boston November 18th. The cargo had already been sold to various persons on the line of the Boston & Maine Railroad, and so could be most conveniently discharged at the Mystic dock. In consequence of the anthracite coal strike, an unusually large amount of foreign coal was brought into Boston in November and December, 1902, and all vessels engaged in the foreign coal trade were much delayed in their discharge. Many vessels were waiting their turn to discharge at the Mystic dock. The Roath drew too much water to be berthed safely without some lightering. About December 1st she was lightered of 500 tons, and on December 5th she was berthed in her turn at Mystic dock, and thereafter was discharged at the rate of about 700 tons a day. The charter party provided:

"That the said steamer, * * * being so loaded, shall thereafter proceed with all possible dispatch to Boston, U. S. A., or so near thereunto as she can safely get, and there deliver her cargo alongside any wharf and/or vessel and/or craft, as ordered, where she can safely deliver, always afloat; but if required to shift, the expense of so doing to be paid by consignees, and the time to count, on being paid freight, at the rate of 8/6, say eight shillings and sixpence. (8) The cargo to be taken from alongside by consignees at port of discharge, free of expense and risk to the steamer, at the average rate

¶ 1. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

of 750 tons per day, weather permitting, Sundays and holidays excepted, provided steamer can deliver it at this rate; if longer detained, consignees to pay steamer demurrage at the rate of fourpence per net register ton per running day, or pro rata for part thereof, time to commence when steamer is ready to unload, and written notice given, whether in berth or not. In case of strikes, lockouts, civil commotions, or any other causes or accidents beyond the control of the consignees, which prevent or delay the discharging, such time is not to count, unless the steamer is already on demurrage. Charterers to effect the discharge of the cargo, steamer paying one shilling (25 cents) per ton of 20 cwt., or 1,015 kilos, and providing only steam, steam winches, winchmen, gins, and falls."

The claimant has contended:

(1) That the lay days did not begin before the steamer's arrival at her berth in Mystic dock. The English cases seem to sustain this contention, where the charter party does not contain the phrase "whether in berth or not." Murphy v. Coffin, 12 Q. B. D. 87. Whatever may be the rule in the absence of these words, they are plainly intended to settle the controversy which might otherwise arise between charterer and owner. Whether this settlement is effected by fixing the period when the voyage is ended, or by fixing the time when the lay days begin, irrespective of the end of the voyage, need not be determined here. That the lay days began when the vessel was in port ready to discharge, "whether in berth or not," is clear. The American cases are not more favorable to the claimant than are the English.

(2) That the lay days did not begin until the vessel was really ready to unload, having come to the wharf, or as near it as she could get, with hatches off, winches ready, etc.; that the time should not be reckoned from the notification given to the charterer just after the vessel had come to anchor in the lower harbor. This is true. "Ready to unload" means actually ready to discharge, so far as the vessel can be made ready by those controlling her. In this case the steamer was "ready to unload" November 18th.

(3) That the vessel must deliver alongside the wharf, and that demurrage did not begin until she was ready to do so. This contention is answered under 1 and 5. If the charterer undertook, in effect, to find the steamer a berth, he is liable for the delay caused by her not getting one.

(4) That the delay was caused by "strikes." The connection of the strike with the delay was too remote. This has been held in cases where the connection was closer than here.

(5) That the delay was due to "other causes or accidents beyond the control of the consignees." In Davis v. Wallace, 3 Cliff. 123, the charter gave the vessel "quick discharge," and made the charterers liable "provided detention should happen by their own or their agent's default." It was held that the charterers were liable for the delay caused by the vessel's waiting her turn. This case is an authority for the libelant. It is not disputed that an agreement to discharge at a fixed rate is at least as absolute as one to discharge with quick dispatch. Liability for delay happening by the charterer's default is not more extensive than that for delay not arising from causes or accidents beyond the charterer's control. Libelant's counsel, indeed, did not seriously contend that he could prevail if Davis v. Wallace were

followed here. He urged that the language there used concerning the charterer's default was overlooked by the court, and that the case has since been overruled, or at least doubted. But Davis v. Wallace has been cited and approved many times, and the decision has never been called in question. In some opinions the default clause was specifically mentioned. See Futterer v. Abenheim, Fed. Cas. No. 5,164; Gronstadt v. Withoff (D. C.) 15 Fed. 265; Id. (C. C.) 21 Fed. 253; Sleeper v. Puig, Fed. Cas. No. 12,940; Mott v. Frost (D. C.) 47 Fed. 82, 84; Hagar v. Elmslie, 107 Fed. 511, 46 C. C. A. 446; Moody v. Five Thousand Laths (D. C.) 2 Fed. 607; Williams v. Theobald (D. C.) 15 Fed. 465; Fish v. 150 Tons (D. C.) 20 Fed. 201; Thacher v. Boston Gas Co. 2 Low. 361, Fed. Cas. No. 13,850; Keen v. Audenried, Fed. Cas. No. 7,639; Davis v. Pendergast, Fed. Cas. No. 3,647; Carbon Co. v. Ennis, 114 Fed. 260, 52 C. C. A. 146. If there be anything to the contrary in Flood v. Crowell, 92 Fed. 402, 34 C. C. A. 415 (which is not asserted), it is opposed to all other authorities. In Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106, the court assumed that Davis v. Wallace was correctly decided, and was at pains to show that delay caused by bombardment was not analogous to delay caused by crowded wharves. Cases like The Viola (D. C.) 90 Fed. 750, are concerned only with the discharge of vessels in the absence of express agreement. If there be material difference between American and English law on the question here presented, the former must prevail, as it is the lex loci solutionis; but by English law the result would probably be the same. Thus in Re An Arbitration, 8 Asp. M. L. C. 330, the words in question, which are commonly used in English charter parties, were held to mean causes ejusdem generis with those previously mentioned.

Following Davis v. Wallace, I hold that the libelant is entitled to recover.