## Case No. 3,647.

DAVIS et al v. PENDERGAST et al.

[16 Blatchf. 565.] [1]

Circuit Court, S. D. New York.   Aug. 5, 1879.[2]

DEMURRAGE—DEFAULT BY CHARTERERS—RUNNING DAYS—PORT REGULATIONS—LIGHTERS.

The libellants executed to the respondents a charter party of a vessel for a voyage from New York to Rio de Janeiro, by which "forty-five" running days were allowed for loading and discharging, and, if the vessel was longer detained, the defendants were to pay damages, at so much per day, provided such detention should happen "by default" of the respondents: *Held*, that the respondents took the risk of detention by intervening Sundays and holidays and by custom house and port regulations as to taking in or discharging cargo, lack of wharfage or lighterage facilities, not due to any fault of the vessel, and the like; and that detention by any of those risks placed the respondents in "default" and rendered them liable for demurrage.

[Cited in Snow v. Three Hundred and Fifty Tons of Mahogany and Cedar, 46 Fed. 130; Smith v. Harrison, 50 Fed. 566; McLeod v. Sixteen Hundred Tons of Nitrate of Soda, 55 Fed. 531.]

[Appeal from the district court of the United States for the southern district of New York.]

This was a libel in personam, filed in the district court, in admiralty. That court dismissed the libel [Case No. 3,646], and the libellants [William R. Davis and others] appealed to this court. This court found the following facts: "In the month of September, 1866, the parties hereto executed a char-

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Reversing Case No. 3,646.]

ter party, by which the libellants chartered to the respondents [Charles H. Pendergast and others] the bark Mary and Louisa for a voyage from New York to Rio de Janerio, Brazil. The provisions of the charter party material 'to the decision of the cause are as follows: 'It is further agreed between the parties to this instrument, that the said parties of the second part shall be allowed, for the loading and discharging of the said vessel, at the ports aforesaid, lay days as follows, that is to say, forty-five running days for loading and discharging; and, in case the vessel is longer detained, the said parties of the second part agree to pay to the said parties of the first part demurrage at the rate of nine pounds sterling per day, day by day, for every day so detained, provided such detention shall happen by default of the said parties of the second part, or their agent. It is also further understood and agreed, that the cargo shall be received and delivered alongside, within reach of the vessel's tackles, or according to the customs of the port. It is also further understood and agreed, that this charter shall commence when the vessel is ready to receive cargo at her place of loading, and notice thereof is given to the parties of the second part, or to their agent, in writing. Vessel to be consigned to charterer's friends at port of discharge, subject to a commission of two and a half per cent.' Thirty-two days were consumed in loading. The cargo consisted of 210 tons of coal, about 130,000 feet of lumber belonging to the respondents, and an assorted cargo of general merchandise, belonging to various consignees. The bark was consigned to the agents of the respondents in Rio de Janeiro. She arrived out on the 19th of December, and was ready to discharge cargo on the 24th, of all which the agents of the respondents were duly notified. The cargo was not finally discharged until January 19th. By the custom house regulations, the assorted cargo could only be discharged at the custom house, either from the vessel alongside, or by means of lighters. If lighters are employed. the expense is paid by the vessel. If the discharge is made at the custom house, the vessel must wait her turn for a place alongside. All the cargo on the bark was discharged upon lighters except the coal, which was delivered from the vessel at a wharf. The lighters were furnished by the consignees and paid by the vessel. Seven days were occupied in discharging the coal, when it might have been put out in half that time. The reason for this delay was, that the coal had been sold by the agents of the respondents, and was to be delivered at the rate of thirty tons per day. The lumber was delivered from the lighters to the different persons to whom it had been sold by the agents of the respondents. Much delay was caused by this mode of doing business, sometimes on account of the great distances the lighters were sent, and sometimes by the refusal of parties to take the lumber. There was no time when the persons receiving the cargo were delayed by the vessel. The lumber could have been put off in a little more than two days at the wharf, or upon lighters, if they had been ready to take it. The master of the vessel frequently called upon the consignees to furnish him with lighters more rapidly. The assorted goods were discharged by the lighters as soon as they could have been if the vessel had waited her turn at the custom house. The charter money, £700, sterling, was payable on delivery of the cargo at the port of discharge."

Welcome R. Beebe, for libellants.
John N. Whiting, for respondents.

WAITE, Circuit Justice. The lay days allowed by this charter are forty-five running days, that is to say, forty-five days as they run, day by day, from the time the vessel was ready and in a condition to load or unload, and notice thereof to the respondents or their agents. The term "running days" was evidently employed to exclude the idea of working days only. This throws upon the respondents all the risks of detention by intervening Sundays and holidays, as well as by the ordinary interruptions incident to the business, such as custom house and port regulations in reference to the manner of taking in or discharging cargo, lack of wharfage or lighterage facilities, not due to any fault of the vessel, and the like. The respondents, in effect, agreed that no more than forty-five runnings days should be occupied in loading and discharging the cargo, unless it was occasioned by some fault of the vessel, or some unusual and extraordinary interruption that could not have been anticipated when the contract was made. Detention by reason of any of the risks assumed by the respondents placed them in "default," within the meaning of that term as used in the charter, and rendered them liable for the stipulated demurrage.

It is conceded, that thirty-two days were occupied in putting the cargo on board. No complaint is made by the respondents on this account. The testimony shows, that the vessel was ready and in a condition to commence unloading on the 24th of December, and the agents of the respondents were duly notified on that day. She was then at anchor on the anchorage ground set apart by the port regulations for vessels lying in the harbor for a discharge of cargo. It is also shown, that, by the customs regulations, the assorted cargo could only be unloaded into the custom house from the vessel alongside, or by lighters. If discharged from the vessel into the custom house, it would be necessary for the vessel to wait her turn to come alongside. In this case, lighters were employed and paid by the vessel, as it was supposed in this way time might be saved, other vessels being ahead at the custom house. No

specific charges of neglect are made against the vessel. The respondents required that their agents at Rio de Janeiro should be her consignees. This was, undoubtedly, to avoid disputes as to her diligence in discharging, and also to accommodate the respondents in receiving cargo. If, by reason of their agency for the respondents, the consignees failed in their duty to the vessel, it is not right that the respondents should be charged with the loss. It was the duty of the consignees to employ lighters for the vessel, when required. In this case, the consignees were repeatedly asked by the master to send lighters along more rapidly, and I cannot but think that the delay was caused by a scarcity of lighters, or an inability to unload them at the custom house, or, by what is, perhaps, even more likely, a desire on the part of the consignees to accommodate themselves, as the agents of the respondents, in making their deliveries to purchasers under sales effected after the vessel arrived in port. Certainly, I can see no fault on the part of the vessel. She was ready to unload, within the meaning of the charter, when she was at a place in the harbor where she could be unloaded, and had done all that was required of her in furnishing the facilities for unloading. In point of fact, she was prevented from going alongside of the custom house for want of room; the agents of the respondents preferred to have the lumber put out on lighters, so as to facilitate their own deliveries, and the coal, although finally put out on a wharf, was kept back by the same agents, to enable them to comply with their own contracts of sale.

Without pursuing the subject further, it is sufficient to say, that, after a careful consideration of all the evidence, I am clearly of the opinion that the detention beyond the stipulated lay days was caused solely by the default of the respondents, within the meaning of the charter, and that, as a consequence, they are liable for the stipulated demurrage, and interest from January 19th, 1867. The charter money and demurrage were payable in Rio de Janeiro. As no attempt has been made to show the legal rate of interest at that place, it may be calculated at the rate of six per cent. per annum.

A decree may be prepared in favor of the libellants, for the legal value, in dollars, of £117, and the accrued interest.