## SNOW *et al. v.* 350 TONS OF MAHOGANY AND CEDAR.[1]

*(District Court, S. D. New York.    April 24, 1891.)*

CHARTER-PARTY—"DEFAULT" OF CHARTERER—CONSTRUCTION—VIOLATION OF CUSTOM
    LAWS—CLEARANCE REVOKED—DEMURRAGE—DETENTION.

    The charter of a brig provided that "for each and every day's detention by default of the charterers, $30 per day should be paid" as demurrage. The brig loaded mahogany and cedar at Laguna, Mexico, and when completely loaded, was delayed 67 days by the action of the customs authorities of the port, who compelled the unloading and remeasurement of the cargo on the charge of smuggling, and attempted under-statement of cargo, and non-payment of full export duties by the charterers. Though the difficulty mainly grew out of what proved to be an erroneous construction of the Mexican law by the customs officers, yet the evidence showed that the charterers had not paid the proper amount of duties, though the error was small, and had not stated to the officers the known measurement of the cargo. *Held*, that the charterers were bound to do all that belonged to them to get a proper clearance, and the detention was by their default, within the terms of the charter contract. In a suit by the ship-owners against the cargo to recover freight and demurrage under the charter-party, it was therefore *held*, that the libelants were entitled to recover.

In Admiralty. Suit to recover freight and demurrage.
*Carter & Ledyard*, (*Mr. Balkam*, of counsel,) for claimants.
*Wing, Shoudy & Putnam*, for libelants.

BROWN, J. The above libel was filed to recover $2,271.01 freight, and $2,010 demurrage, for 67 days' detention of the brig Caroline

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

Gray at Laguna, Mexico. The cargo in question, consisting of mahogany and cedar, was loaded on the brig at Laguna, under a charter to Messrs. Bulnes Bros., by the terms of which the brig was to have for loading, in Mexico, 25 days, Sundays excepted. The charter provided that, "for each and every day's detention by default of the charterers, $30 per day should be paid" as demurrage. The brig was loaded within the specified lay-days by the charterers, who were owners of the cargo; a bill of lading therefor, prepared by the charterers, was signed and delivered by the master, and clearance papers for the ship were delivered to him by the charterers on Saturday, the 13th of April. On the same day the captain applied for a pilot, and was told none could go till the next morning, when, upon renewed application, he was informed that the departure of the vessel was prohibited by the customs authorities. On returning to his vessel he found two customs officers on board in charge of the ship. The cargo was subject to an export duty on both the mahogany and the cedar. The charterers had made an entry at the custom-house for the cargo, and had paid certain duties. The departure of the vessel was stopped upon the charge of smuggling, and attempted fraudulent under-statement of cargo, and non-payment of the full lawful duties by the charterers, and the cargo was ordered to be unloaded for the purpose of remeasurement, whereby the vessel was delayed until June 26th, when she sailed with her cargo on board, which was subsequently delivered to the consignees in New York. In the case of *Davis* v. *Pendergast,* 16 Blatchf. 565, the demurrage clause was, in effect, like the present, in providing that demurrage should be paid for any detention "by default of the charterers," 45 running days being allowed in loading and discharging. Chief Justice WAITE there held that "detention, by reason of any of the risks assumed by the respondents, places them in default, within the meaning of the charter." And in *Rumball* v. *Puig,* 34 Fed. Rep. 665, it was held that a clause in the charter similarly worded was designed to "bind the charterer for the neglect of any duty required of him to enable the vessel to sail." It was the duty of the charterers in this case to enter the goods properly at the custom-house, and to pay the proper amount of duties. They did not do so, although, as it turned out, the error on their part was but small. The difficulty, for the most part, grew out of what proves to have been an erroneous construction of the Mexican law by the local officers of the customs at Laguna as to the proper mode of ascertaining the duties payable on mahogany; the officers claiming that it was by measurement of the mahogany itself, while the shippers claimed it was according to the tonnage capacity of the ship. In the controversy that arose on this point, the charterers were vindicated; but this covered only the duties upon the mahogany, although that was the principal part of the cargo. As respects the cedar, the charterers were wrong, the duties being payable upon the measurement of the wood; and the amount shipped was found on remeasurement to be nearly double the quantity entered, and on which duties had been paid. Upon two trials growing out of this matter in the administrative courts of Mexico, the charterers were acquitted

in the criminal suit that charged smuggling, fraud, and conspiracy; but in the other they were held civilly liable for the payment of a certain amount of double duties as a penalty for infringing the law, which amount, without further appeal, was paid by the charterers. The decree in the latter suit declared that they had "attempted to evade in part the payment of the fiscal duties."

Upon these facts, I deem it unnecessary to consider many of the details presented in the elaborate and able brief of counsel. I must find that the entry and payment of duties were in part incorrect and insufficient. To that extent the action of the customs officials was justified by the event. The manifest, and the payment of duties, as respects the mahogany, were wrong, because less than the ship's measurement, deducting the cedar; and the duties paid on the cedar were confessedly too small. The evidence leaves no doubt that the charterers knew the measurement of all the wood shipped, since the bill of lading, made out by them, states the measurement very nearly correctly. If the difficulty as to the mahogany arose primarily from the erroneous construction of the law by the officials, it must be inferred that the charterers were willing to profit by the error, since they did not communicate to the officials their own measurement of the mahogany, when entry and payment according to measurement were demanded, but accepted and paid duties upon a subsequent very low official measurement, which the charterers must have known, I think, to be grossly incorrect. Payment or deposit of duties in the beginning, according to their own measurement, would have avoided all trouble. It was evidently the original concealment of the charterers' own measurement, and the subsequent disclosure of it by the bill of lading, that led the officials to unload and remeasure the cargo, and this caused the delay. The plain error as to the cedar, though small, was also in itself more than a technical violation of the law, and placed the charterers in default. The vessel had nothing to do with all this, and was in no way responsible for it. The charterers were bound, not merely to get a clearance for the cargo, right or wrong, but to do at least all that belonged to them to do to get a proper clearance. The clearance they obtained was justly liable to be revoked, and was revoked, and the vessel was stopped, because the charterers did not make a true and correct manifest, nor pay or tender sufficient duties. The detention that grew out of this failure was therefore a detention by their default, within the terms of the charter contract. It is said that if the master had departed instantly, when the clearance papers were given him in the forenoon of Saturday the 13th, the vessel would have escaped seizure, and the delay have been thus avoided. The master testified that he did not obtain his papers until about 4 o'clock in the afternoon, and then applied for a pilot, and was told that he could not have one that night, but could have one the next morning, and early the next morning the vessel was seized, as above stated. The interval of a few hours, from about 10 to 4 at most, even if the charterers are correct as to the time when the clearance papers were sent to the ship, is quite too small to hold the ship in fault for the subsequent detention. In no sense was it the proxi-

mate cause. The interval was in fact no more than a reasonable time for the master to produce the clearance papers before the American consul at the port of Laguna, pursuant to section 4309, Rev. St. U. S., in order to obtain the ship's papers to enable her to sail. The subsequent production by the master of his copy of the bill of lading before the consul, pursuant to his request, for the inspection of the customs officers, was no breach of any obligation to the charterers, however great may have been the discrepancy thereby disclosed between the tons loaded and the amount stated in the entry, of which the master was ignorant. Decree for the libelant for the homeward freight, as claimed, with demurrage during the delay at the charter rates, with costs.