**THE MARPESIA. THE CLYDE. BRUUSGAARD v. ACOSTA et al.**
(two cases.)

(Circuit Court of Appeals, Second Circuit. July 6, 1923.)

Nos. 254, 255.

I. Shipping ⬳52—Rights of owners under charter held not affected by inability of charterer to furnish cargoes.

The rights of shipowners under charters to carry cargoes of coal to Buenos Aires, during the war period, when export licenses for coal were required, the charterer contracting to provide full cargoes, consigned to "person or firm approved by British authorities," *held* not affected by the fact that when the charters were made the charterer had not procured licenses for the cargoes, and was unable to do so because it had previously contracted the coal, and later assigned the charters, to a subsidiary of a

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

German corporation, and on objection by the British authorities licenses were refused, of which facts the owners had no knowledge.

**2. Shipping ⬒▷175—Delay by charterer in loading held not excused.**

Delay in loading a cargo of coal, beyond the lay days allowed by the charter party, *held* not excused by delay in obtaining a necessary export license for the coal, the duty to obtain which rested on the charterer, though both parties knew of the necessity when the charter was made, where it could have been, and frequently was, obtained before the making of a charter, and it did not appear that the shipowner knew that it had not been and especially where the delay was occasioned by the persistence of the charterer in naming a consignee not acceptable to the government authorities.

**3. Shipping ⬒▷175—Charterer liable on contract to pay demurrage, unless owner is responsible for the delay.**

A charterer, who has agreed to load or unload within a fixed period of time, is answerable for nonperformance of that agreement, whatever the nature of the impediments, unless they are covered by exception in the charter party or arise through the fault of the shipowner or those for whom he is responsible.

**4. Shipping ⬒▷173—"Default" in charter party means any failure to perform not caused by vis major.**

In a charter party binding charterers to pay demurrage for each and every day's delay caused by their default, "default" means failure to perform whatever charterers were bound to do, without regard to how the failure came about, subject only to the doctrine of vis major.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Default.]

**5. Shipping ⬒▷52—Conditions held not implied in charter parties.**

In charter parties of vessels to carry cargoes of coal to a foreign port, for which export licenses were required, but which named no consignee, there can be no implied condition that charterers shall be relieved of all liability under the charters on their failure to obtain licenses to ship to a particular consignee.

**6. Shipping ⬒▷173—Cesser clause in charter party not retroactive.**

The cesser clause in a charter party, providing that "charterer's responsibility, except as to payment of freight, to cease upon signing of bills of lading," is not retroactive, and does not relieve the charterer from liability for demurrage incurred before the bills of lading are signed.

Appeals from the District Court of the United States for the Southern District of New York.

Suits in admiralty by Karl Bruusgaard, owner of the Norwegian bark Marpesia, and by Sigurd Bruusgaard, owner of the Norwegian ship Clyde, against John D. De Acosta and another, doing business as Acosta & Co. Decree for respondents in first suit, and libelant appeals. Reversed. Decree for libelant in second suit, and respondents appeal. Affirmed.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for libelants.

Bigham, Englar & Jones, of New York City (Oscar R. Houston and William H. Woolley, both of New York City, of counsel), for Acosta & Co.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. These are two suits in admiralty; one being brought to recover demurrage on the bark Marpesia, and the other

seeking to recover demurrage and damages for failure to perform a charter party on the vessel Clyde. In the first of these suits (the Marpesia) the court below dismissed the libel. In the second (the Clyde) the libelant was held entitled to recover both demurrage and damages. The libelant has appealed in the first case. The respondents have appealed in the second. The two appeals were heard together in this court, and will each be disposed of in this opinion. While there are certain issues peculiar to each of the cases, which will be pointed out hereafter, the main issues are common to both.

The libelant in each case is a resident of Norway. The respondent Jose D. De Acosta is a native-born citizen of the United States, born in the city of New York. The respondent Hilarion Larguia is a citizen of the Argentine Republic and resides in Buenos Aires. He describes his occupation as that of lawyer and merchant. Together they constitute the firm of Acosta & Co. This firm maintains an office in the city of New York; De Acosta being in charge of the New York office, and Larguia in charge of that in Buenos Aires. The respondent the Consolidation Coal Company, Inc., is a corporation organized and existing under the laws of the state of Maryland. · It has its principal place of business in Baltimore, but also maintains an office in the city of New York, in the Southern district of New York. It is hereinafter called the Coal Company.

[1] The libels allege that the libelants and the respondent Acosta & Co., acting as agent of its undisclosed principal, the Coal Company, entered into the charter parties for the charter of the Marpesia and the Clyde, each to carry a full and complete cargo of coal in bulk to Buenos Aires. The charter party for the Marpesia purports to have been concluded on September 1, 1917. That for the Clyde purports to have been made on July 30, 1917. The Marpesia charter party was for a voyage from Norfolk, Va., or Newport News, Va., one port only, at charterers' option, orders to be given immediately on vessel's arrival at Hampton Roads, to Buenos Aires, Argentina. The charter party for the Clyde was exactly similar in the designation of the ports from and to which the vessel was to go. In both charter parties Acosta & Co. agreed to provide and furnish to the respective vessels "a full and complete cargo of Chesapeake & Ohio Coal & Coke Company's coal in bulk under deck" upon the terms specified. The two charters contained the following provisions:

"The said party of the second part doth agree to provide and furnish to the said vessel a full and complete cargo of Chesapeake & Ohio Coal & Coke Company's coal in bulk under deck and to pay to said party of the first part or agent for the use of said vessel during the voyage aforesaid freight as agreed, payable at New York, viz. * * * The act of God, public enemies, fire, floods, storms, drought, strikes or any occurrence beyond the control of either party, and all dangers, delays, or accidents of the seas, rivers railroads, and navigation, of whatever nature and kind, always mutually excepted. * * *

"It is agreed that the lay days for loading and discharging shall be as follows: Commencing from the time the captain reports himself ready to receive or discharge cargo. At loading port for loading, customary dispatch, and at port of discharge for discharging, cargo to be received at the rate of not less than two hundred and fifty (250) tons per running day. Sunday and legal holidays excepted. Lay days to count 24 hours after vessel's arrival in Buenos

Ayres roads. * * * Freight to be prepaid in New York on signing bills of lading without discount or commission. * * * Cargo to be discharged by consignees of cargo and at their expense. And that for each and every day's detention by default of said party of the second part or agent five hundred dollars ($500) United States gold per day, day by day, shall be paid by the party of the second part or agent to the party of the first part or agent.

"Charterers guarantee that no cargo under this charter will be owned by or consigned to enemies of Great Britain or of her Allies. * * * Charterers agree and guarantee that no cargo carried under this charter unless shipped by and consigned to person or firm approved by British authorities."

It appears that prior to the making of these charter parties, and on August 14, 1914, the Coal Company had entered into an agreement extending over a period of 10 years with Acosta & Co. by which the Coal Company agreed that it would sell and furnish to Acosta & Co. exclusively its coal for resale by the latter in the republic of Argentina. The agreement provided that during the life of the contract Acosta & Co. would not deal in or handle, as agent or otherwise, any other coals than the coal furnished and sold to them by the Coal Company, without first obtaining the consent in writing of the latter, unless the Coal Company was for any reason unable upon proper request and notice to furnish and sell coal of the quantity required. In that case, having obtained from the Coal Company a written statement of its inability to furnish the coal, Acosta & Co. were to be free to purchase such quantities of coal elsewhere as might be necessary to meet its immediate requirements; and it was agreed that Acosta & Co. should at their own expense provide at the loading ports on dates specified in their orders for deliveries of coal all necessary vessels to receive such coal. The Coal Company, it was agreed, should have no responsibility in respect to any such vessels.

It also appears that under date of March 20, 1917, which was prior to the making of either of the charter parties herein involved, Acosta & Co. had entered into a contract with the Compania Allemana Transatlantica de Electricidad, commonly known and hereinafter referred to as "C. A. T. E." This C. A. T. E. is a Buenos Aires branch of a German corporation, which was authorized to do business in the Argentine Republic under a decree of the republic bearing date of June 4, 1891. It operated a public utility, and supplied light, heat, and power in and about Buenos Aires, and it was the largest consumer of coal therein. Under this contract of March 20, 1917, Acosta & Co. agreed to sell and the C. A. T. E. agreed to purchase 40,000 tons of North American coal, delivery f. o. b. loading port. That contract in paragraph 3 provided as follows:

"The delivery is to be made as soon as possible to the respective North American loading ports, and for the transportation of the coal to Buenos Aires we [Acosta & Co.] binding ourselves to assign to you [C. A. T. E.] from our chartered vessels, sailing or steamers, it being understood that, on receipt by you from us of notice of the name of the steamer or sailing vessel or the charter so assigned, such vessel is thereafter for your risk and account, without any right on our part of the privilege of dispositions otherwise."

It is also important to have in mind certain legislation, executive orders, and proclamations issued by the President of the United States, and which affect the matters to be determined:

(1) The President of the United States, by the Espionage Act of June 15, 1917 (Comp. St. §§ 10212a–10212h), was given power during the war to forbid exports of any commodities which he might designate. This was in force when the charter parties were signed.

(2) The President, acting under the Espionage Act, conferred on the Secretary of Commerce, by the executive order of June 22, 1917, the administration of the export restrictions, and he created an exports council to make recommendations to carry out the purpose of the act. This was in force when the charter parties were signed.

(3) The President by his proclamation of July 9, 1917 (40 Stat. 1683), forbade the export of certain enumerated commodities, including coal, to a number of countries, including Argentine, except under licenses to be issued by the Secretary of Commerce in conformity with certain regulations to be prescribed. This was in force when the charter parties were signed.

(4) The President by executive order of August 21, 1917, established the Exports Administrative Board and transferred to it the power to grant and refuse export licenses.

(5) The Trading with the Enemy Act, which defined enemies and allies of enemies, was approved on October 6, 1917 (Comp. St. §§ 3115½a–3115½j).

(6) The President by an executive order of October 12, 1917, created the War Trade Board, and vested in it power to issue licenses under the Espionage Act, as well as under the Trading with the Enemy Act. From that time it had exclusive control over the granting of licenses for exports both to neutrals and to enemies.

Prior to the signing of either of the charters the President by his proclamation of July 9, 1917, had forbidden the exportation of coal to Argentina and certain other countries, except under license issued by the Secretary of Commerce. The respondents had chartered these ships without first securing licenses for the export of coal. The evidence shows that licenses were commonly granted for such cargoes without difficulty. On the afternoon of July 31, 1917, the day after the Clyde charter was signed, application for a license for that vessel was made, and the application was granted on August 3, 1917. The license stated on its face that it would be "void after 60 days from its date." On September 5, four days after the signing of the charter of the Marpesia, an application was made for a license for the cargo to be carried by that vessel. That license was granted on October 18, 1917. The Clyde license expired on October 2, that being 60 days from the date on which it was granted. The fact that it had expired was discovered on October 4, and an application was at once made for its extension. No action was taken on the application for the extension. A new license was then asked for the Clyde on October 18, and the application was denied on January 3, 1918.

In the case of the Clyde, the obstacle to the issuance of the license was one of Acosta & Co.'s own making. The telegram addressed to the proctors for the libelant on December 17, 1917, by a member of the War Trade Board, shows what seems to have been the attitude of the board throughout the whole controversy. It read:

"License for export coal Clyde will be granted immediately application is made if satisfactory consignee and necessary information given."

But Acosta & Co. refused to designate any other consignee than the C. A. T. E. It may be that, in view of their contract of March 20, 1917, and the naming of the Clyde, they had deprived themselves of the right to name another consignee; but, if that be so, it could not alter the obligations they had assumed to the shipowner, for it is clear that when the charter party was signed the shipowner had no knowledge of the prior contract of March 20, 1917, and he could not be affected or in any way bound by some contract which had been previously made between the charterer and a third person, which restricted the rights of the charterer, but which was not disclosed or in any way known to the shipowner. When Acosta & Co. named the Clyde for C. A. T. E., they and not the shipowner took the risk thereby incurred. It was the charterer's business, and not the shipowner's, to secure the licenses.

The evidence in this record shows convincingly that those in this business so understood it. The president of the wholesale Coal Trade Association of New York was asked, while testifying, whether it was the practice for the shipper to apply for and secure the license. He answered, "Yes, invariably." And his testimony is uncontradicted. In like manner the secretary of a firm of ship brokers and steamship agents was asked as to what the practice was during the period in question with regard to obtaining export licenses, and he replied, "The charterer should attend to it."

Acosta & Co. chartered both vessels before they obtained the government's licenses, or had even applied for them; and before the licenses were obtained Acosta & Co. had agreed to assign to C. A. T. E.—

"from our chartered vessels, sailing or steamers, it being understood, on receipt by you from us of notice of the name of the steamer or sailing vessel or the charter so assigned, that such vessel is thereafter for your risk and account without any right on our part of the privilege of disposition otherwise."

As soon as the vessels were chartered, Acosta & Co. "named" the vessels to the C. A. T. E., and, having named them, considered that from that moment any liabilities which might accrue were the liabilities of the C. A. T. E., and not the liabilities of Acosta & Co. That Acosta so regarded the whole matter appears from his affidavit, in which he states that he had advised his firm in Buenos Aires:

"That such charges (i. e., demurrage) and legal expenditures ought to be paid by the C. A. T. E., and it has been reported to me that my firm has arranged that this should be done."

But there was nothing in the contract which obliged Acosta & Co. to name the vessels until the licenses were granted. If it be true that after "naming" the vessels Acosta & Co. could not withdraw the names and use the vessels for other shipments, the fault was that of Acosta & Co., who should not have named them before the right to ship coal to the C. A. T. E. at Buenos Aires had been granted. Doubtless Acosta & Co. thought there was going to be no difficulty in obtaining the license and they were willing to risk it.

The charterers were bound under the charters to provide full and complete cargoes of coal, and they agreed that if the ships were not loaded on time they would pay demurrage. The charterers took the risks incident to getting the cargoes and those incident to obtaining the licenses of the government. The shipowners never contemplated keeping their ships idle for weeks without compensation, if the charterers failed to get a cargo, or the sort of cargo they wanted, or a license to ship to a particular consignee or purchaser. These we shall find were matters incidental to the business of the charterers, of which the shipowners had no knowledge, and over which they could exercise no control. The responsibility for such matters was never assumed by the shipowners. Is it the shipowners' fault that the charterers were so lacking in foresight as not to obtain their export licenses before they signed the charter parties? Is it the fault of the shipowners that the government disapproved the shipment of coal to the C. A. T. E. because of its German connections? Is the fault that of the shipowners that the charterers insisted on sending the coal to a particular consignee disapproved by the British Embassy, after the charterers had agreed that no cargo should be carried unless consigned to a person or firm approved by the British authorities?

The issuance of the second license to the Clyde was refused because the coal was to go to the C. A. T. E. in Argentina and was objected to by the British Embassy. The policy of the government at that time was that no supplies should be sent out of the country to any German-owned concern in South America. There is no doubt that, if an acceptable consignee had been named, a license would have issued. The War Trade Board made its position plainly known to Acosta & Co., and several times reiterated what had been stated in a letter dated October 2, 1917, to the Coal Company's general sales manager in New York:

"Just as soon as we are convinced that it [the coal] is going to an interest other than German, it can start at once. We are willing to give Acosta & Co. all the time that they want to show this thing, but until we are satisfied with that it won't move."

And during this entire period, when licenses to Acosta and C. A. T. E. were being delayed and refused, licenses for coal to South American ports, including Buenos Aires, were being granted freely. As a rule licenses applied for were obtained within three or four days after the applications were filed.

The first license to the Clyde was granted before the government knew that the C. A. T. E. was to be the consignee. After that license expired, and application for a second license was made, it was held up for more than three months because Acosta & Co. persisted in trying to force it through on behalf of the C. A. T. E. The Marpesia's license was originally delayed for nine days by defective application, and thereafter the delay was due solely to the objection to the C. A. T. E.

Fifty-five per cent. of the stock of the C. A. T. E. corporation, at the times involved herein, was owned by Germans, and the balance of the stock was owned in England. The general manager of the plant was an Englishman, and its board of directors was composed of Eng-

lish representatives, Argentine representatives, and some Germans. Argentina contains a large proportion of people of the German race and during the World War the country caused the Allies and the United States a great deal of anxiety. It is even asserted that Argentina caused the Allies more anxiety than all the rest of South America put together. However that may be, and we express no opinion concerning it, the fact is that the officials of the United States hesitated to permit coal to be sent forward to the C. A. T. E. in Argentina, which was understood to have German affiliations. In addition it seems suspicions were also entertained concerning Acosta & Co.

The respondents called as a witness the trade expert of the Exports Administrative Board at Washington. One of his duties was to pass upon applications for license to ship coal. He stated that the British Embassy had requested the board to withhold licenses for shipments to either Acosta & Co. or to the C. A. T. E. Thereupon he called on the commercial attaché at the British Embassy, and was informed by him that the C. A. T. E. was largely owned by Germans, and that for that reason he did not want them supplied with coal. On his cross-examination his testimony was as follows:

"Q. Well, then, let me broaden my question—it was only because of the fact that the C. A. T. E. and/or Acosta y Cia were concerned that there was any question about it? A. That is the only question that I know about.

"Q. So far as you are concerned, that was why you didn't grant it at once and send it along? A. Yes, sir; and because the British Embassy requested us not to. * * *

"Q. You observe that C. A. T. E. is on this blacklist? A. Yes.

"Q. And that that is dated on the outside of the cover, October 6, 1917? A. Yes.

"Q. It would seem, therefore, would it not, that they were blacklisted? A. It would seem that they were on that list; yes. * * *"

It is also in evidence that, if Acosta had acted on the suggestion made to him to name some other consignee, the license would probably have been granted on October 6th or 7th. One of the officials connected with the board testified as follows:

"Q. Isn't it a fact that, if Mr. Acosta had named an acceptable consignee at that interview, the license would have been granted then and there? A. Probably, yes."

The following excerpt is from a deposition introduced into the record by the respondents:

"A. The C. A. T. E. belongs to a corporation founded at Berlin, Germany, under the name of 'Deutsch-Uberseeische Elektricitaets-Gesellschaft,' which is subject to German law. The C. A. T. E. is the Buenos Aires branch of the said corporation."

There is no doubt that the C. A. T. E., though incorporated in Argentina, was a branch of a German parent company. The opinion was expressed in the House of Lords in Daimlar Co. v. Continental Tyre & Rubber Company, [1916] 2 A. C. 307, 337, 338, that a company incorporated in England and carrying on business within the United Kingdom might have an enemy character, if the majority of its stockholders resided in Germany during the war with that country. We need not consider that question in these cases; for in the instant cases

the charterers had expressly agreed and guaranteed that no cargo would be carried under the charters "unless shipped by and consigned to person or firm approved by British authorities." And as the evidence shows the C. A. T. E. was disapproved and objected to by the British authorities, and, while the application for the second license for the Clyde was still pending, was blacklisted by the British and later by the American authorities. The attempt to ship to the C. A. T. E., the particular consignee named by Acosta & Co., cannot be regarded in conformity with what we have seen the charterers agreed and guaranteed— "that no cargo carried under this charter unless shipped by and consigned to person or firm approved by British authorities."

A commission issued in both the cases under consideration to take the testimony of Larguia in Argentina. Certain of the interrogations propounded to him and the answers thereto are interesting, and explain the conduct of respondents in insisting that the license issue for the C. A. T. E.:

"Twenty-ninth interrogatory: By the terms of said sale, was Acosta y Cia entitled to dispose of the cargo on the vessels Clyde and Marpesia to any purchaser other than the C. A. T. E., except in the event that a license to ship the cargo to the C. A. T. E. had actually been refused by the government of the United States? A. No.

"Thirtieth interrogatory: If your answer to the next previous question is 'No,' please explain the matter fully, referring to the terms of the contract or other facts or to the Argentine law on which you base your opinion. A. Acosta & Compania could no longer dispose of the coal loaded on the sailing vessels Clyde and Marpesia, because the coal no longer belonged to them. The delivery by Acosta & Compania to the C. A. T. E. having taken place the moment the coal was loaded on board the vessels, the ownership of the coal passed to the C. A. T. E., nor could have Acosta & Compania disposed of the Clyde or Marpesia charters; the charters having been confirmed to C. A. T. E. as applying for their account and risk to lift their coal. If Acosta & Compania had disposed of this coal after its delivery, which took place the moment the coal was loaded, such act would have constituted a misdemeanor under the Argentine criminal law.

"Thirty-first interrogatory: If in answering the next previous question you rely upon any provisions of the Argentine law, please state your qualifications to express an opinion as an expert on the Argentine law. A. My answer to the next previous question is based on my being a duly qualified Argentine doctor of law."

But while this testimony makes plain the awkward position the respondents had gotten themselves into by the obligations they assumed without having first obtained their licenses, their contract being unknown and undisclosed to the shipowners at the time the charter parties were signed cannot affect the legal obligations the charterers assumed as respects the shipowners.

[2] The Marpesia arrived at Norfolk on September 4, 1917, but did not give written notice to load until September 15, and was then directed by the Coal Company to Sewall's Point, where she proceeded, but did not get a loading berth at the pier until October 22. The reason for this delay was due to the fact that the charterer had not procured an export license from the government and would not load without it. The vessel completed loading in 11 days (one being Sunday) on November 2. The clearance papers were delivered by the representative of the Coal Company on November 9 at 5 p. m., and on November 10

the vessel sailed. The claim, on behalf of the Marpesia is (1) for delay of 34 days in loading; and (2) for delay of 8 days after loading, due to a controversy between the master of the ship and the Coal Company—the former insisting and the latter denying the right of the master to place upon the bills of lading an indorsement to the effect that the owners had a lien for demurrage. A total number of 42 days of delay was thus claimed on behalf of the Marpesia.

The Clyde reported ready on September 19, 1917, and on September 21 she took on 515 tons of coal as stiffening. She then returned to a dock and discharged the balance of her ballast. The master reported to complete the loading on September 28, and on October 4 she obtained a berth and loaded part of her cargo. On the afternoon of that day it was discovered that the license for the Clyde had expired, and the matter of either extending the original license or obtaining a new license was taken up with the officials at Washington, and the license was finally refused on January 3, 1918. The failure of the attempt to obtain a second license for the Clyde was caused by the objection which the government officials had to the C. A. T. E. as the consignee of the coal. The evidence in the record discloses that during the entire period herein involved the government of the United States was issuing licenses for the export of coal to South American countries including Argentina, and the license applied for on behalf of the Clyde was denied because of the German character and affiliations of the C. A. T. E., and because the British Embassy disapproved of the shipment to it. We have no doubt, and the court below had none, that during this time a license could have been easily and promptly obtained if Acosta & Co. had only consented to name a proper consignee for the receipt of the coal at Buenos Aires.

The court below held in the case of the Marpesia the libelant was not entitled to a decree, because he thought that while it was the duty of the charterers to obtain the license the duty was simply "to obtain the license without any unnecessary delay." The mere fact, he said, that the regulations for export existed at the time the charter party was made "was notice to both parties that there might be some delay." Therefore in his opinion the question was whether there was any "unnecessary delay." As he believed the delay from September 15, when the Marpesia gave notice that she was ready to load, to October 18, when the license was granted was attributable to the officials of the War Trade Board and not to the charterers, he held that a delay of a month in war time under these circumstances could not be said to be unreasonable. As respects the delay after loading caused by the insistence of the master that he had the right to place upon the bills of lading an indorsement that the owners had a lien for demurrage, he held that it was not chargeable to the respondents.

We are unable to approve the conclusion which the learned judge reached that for the reasons stated the libel should be dismissed. We do not agree that the fact that the regulations for export existed at the time the charter party was signed was in itself notice to both parties that there might be some delay, and that the shipowner must have anticipated delay in securing the license. This proposition assumes that no

license could be obtained until a ship had been chartered; for if the charterer could have obtained a license before he made the charter there was no reason for the shipowner to suppose that he had not done so, and consequently no reason to anticipate delay. The shipowner was not obliged to assume that the charterer had contracted to export a cargo that he had not received permission to export. The court assumed the contrary, and the assumption is unsupported by anything in the record. That the assumption was erroneous is shown by the fact that the license first issued for the cargo to be carried by the Clyde contained no mention whatever of that vessel.

After the court's decision in the Marpesia Case was handed down the libelant's proctors made an affidavit to the fact that licenses could be and frequently were secured before ships were named or chartered, and asked that the proofs be reopened for evidence on this subject. This application the court denied, stating that it was not material and would not affect the decision. The court appears to have decided the Marpesia Case in reliance upon what was said by Bailhache, J., in Owner of Spanish Steamship Sebastian v. De Vizcaya, [1920] 1 K. B. 332, 335, a decision in a court of first instance. The learned and able judge who decided this matter below quotes from that case the following statement:

"The cargo which was being loaded was of such a character that it might involve the detention of the ship while the necessary export license was being obtained."

Then he adds:

"On the other hand, as also said by Bailhache, J., in the same case: 'It was the duty of the charterer to obtain the license without any unnecessary delay.'"

The English judge thus decided the case upon the theory that the license was obtained without unnecessary delay, and that it was therefore impossible to hold that the consequences of the delay fell upon the charterer rather than upon the shipowners. But certain important distinctions exist between the above case and the Marpesia Case:

(1) In the Sebastian Case the charter was made before the license legislation was enacted, while in this case the charter was made afterwards. In that case the charterer did not, as here, enter into the contract with full knowledge that he would have to get a license.

(2) In the Sebastian Case there was no personal objection to the consignee, as there was in this case. Acosta & Co. persisted in its demand for a license to carry to a consignee objectionable to the government because of its German association.

(3) The Sebastian Case, and this is the most important difference between the two cases, was not a case of demurrage at all. The lay days had been complied with. The steamer arrived on July 14, and the loading was completed on July 18, which was within the time specified in the charter party.

(4) In the Sebastian Case there was no clause like those in the charters now before us, making the charterers responsible for all detentions caused by their default.

Whether that case was rightly or wrongly decided upon the facts involved therein it is unnecessary for us to say, as the facts in that case are so essentially different from the facts in the instant cases. The doctrine of that case we are entirely satisfied cannot be applied to the cases now before the court, without disregarding the established law of the United States and the highest courts of England.

[3] In 1670, in Paradine v. Jane, Aleyn, 26, it was declared that:

"Where the law creates a duty, or charge, and the party is disabled to perform it without any act in him, and hath no remedy over, there the law will excuse him; but where a party, by his own contract, creates a duty or charge upon himself, he is bound to make it good if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract."

And the proposition remains to this day a fundamental principle of the law of England and of this country. It is in accordance with that principle that, if a lessee covenanted to keep a house in repair, he is bound, "though it be burnt by lightning or thrown down by enemies." Dyer, 33a. And in an action on a charter party for not loading a cargo of barley at Liebau, it was no answer that exportation of such grain had been prohibited by the Russian government and was no longer in the defendant's power to perform. "The reason of this," said Lord Kenyon, citing from Co. Litt. 209a, "is clear. If a man undertakes what he cannot perform, he shall answer for it to the person with whom he undertakes." Blight v. Page (1801) 3 B. & P. 295, note. And see, also, Sjoerds v. Luscombe (1812) 16 East, 201.

The present actions have been brought by the shipowner against the charterers, and the Coal Company associated with them, for failure to perform their charter parties in accordance with what they promised. If what was undertaken has not been performed, is there any reason which exempts them from liability to the person with whom they undertook? The law on this subject is well established in England and in this country. The rule was recently in the House of Lords emphatically stated in Alexander & Sons v. Aktieselskabet Hansa, [1920] App. Cas. 88, and it was held that if the charterer has agreed to load or to unload within a fixed period, his agreement is absolute and unconditional, and for its nonperformance he is answerable, "whatever may be the nature of the impediments which prevent him from performing it, and which cause the ship to be detained in his service beyond the time stipulated. It was declared by Viscount Finlay in announcing the judgment that:

"If the charterer has agreed to load or unload within a fixed period of time (as is the case here, for certum est quod certum reddi potest), he is answerable for the nonperformance of that engagement, whatever the nature of the impediments, unless they are covered by exception in the charter party, or arise through the fault of the shipowner or those for whom he is responsible."

And in the above case Lord Shaw went on to say:

"The risk of vicissitudes which prevent the loading or discharge of cargo within the stipulated lay days lies unconditionally with the charterer. This is the prescription of the general law. To avoid its application either (1) the contract of parties must be absolutely clear; or (2) it must be established that the failure of the charterer's duty arose from the fault of the ship-

owners or those for whom they are responsible. The law of Scotland is identical with that of England on this topic. Mr. Bell is as clear as the English judges quoted when he says in his Principles: 'When lay days and demurrage are stipulated, the shipper's obligation is absolute not to detain the ship beyond the days; and he will be liable for the demurrage, or for the loss arising from further detention, although occasioned by circumstances over which he has no control.' Recent cases in Scotland have followed this clear rule."

This doctrine is amply sustained by the authorities. Thiis v. Byers, L. R. Q. B. D. 244; Ashcroft v. Crow Orchard Colliery Co., L. R. 9 Q. B. 540; Budgett v. Birmington, L. R. 1891, 1 Q. B. D. 35; Associated Portland Cement Mfrs. v. Cory & Son, 31 Times L. R. 442; Hutton & Co. v. Chadwick, 33 Times L. R. 363. The cases in the United States are in accord with those decided in the English courts. In Crossman v. Burrill, 179 U. S. 100, 113, 21 Sup. Ct. 38, 45 L. Ed. 106, it is declared that the one qualification of the absolute liability of the charterer is that of a vis major amounting to "a sudden and unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers." See, also, Jones v. United States, 96 U. S. 24, 24 L. Ed. 644; Thacher v. Gas Light Co., 2 Low. 361, Fed. Cas. No. 13,850; Davis v. Wallace, 3 Cliff. 123, Fed. Cas. No. 3,657; Davis v. Pendergast, Fed. Cas. No. 3,646; 1,600 Tons of Nitrate of Soda v. McLeod, 61 Fed. 849, 10 C. C. A. 115; Southern Transportation Co. v. Unkel (D. C.) 236 Fed. 779; The Olaf (D. C.) 248 Fed. 807; The Hans Maersk (C. C. A.) 266 Fed. 806.

[4] The charterers bound themselves expressly by the charter party to pay to the shipowners $500 for each and every day's detention by their default; and the cases make it clear that "default" in a charter party contract means failure to perform whatever the charterer was bound to do without regard to how the failure came about subject only to the vis major doctrine. And in 7 Am. & Eng. Encyc. of Law, 283, the following rule is stated:

"There is a general principle applicable to contracts of affreightment, as well as to other contracts, that, if what is agreed to be done is possible and lawful, it must be done. The parties thereto are not excused from the performance of the contract by the difficulty or improbability of accomplishing it. It must be shown that the thing agreed to be done cannot by any means be effected. The answer to the objection of hardship in all such cases is that it might have been guarded against by a proper stipulation."

In 36 Cyc. 362, the rule is stated as follows:

"The rule is well established that, where the freighter or charterer agrees absolutely to load or unload the ship within a specified number of days, the fact that subsequent events, such as natural causes or governmental restraints, render performance impossible, is immaterial, but that where no time is mentioned in the contract or where the contract provides against delay due to the fault of the charterer, delay is excused when caused by political or naval disturbances, bad weather, fire, or an epidemic or quarantine."

Where the contract of affreightment fixes in express terms the number of lay days, the rule as stated in Maclachlan's Law of Merchant Shipping (5th Ed.) 579, is as follows:

"If the lay days be exceeded, from whatever cause, he (the charterer) is liable to pay the compensation, unless he is protected by some express provision in the contract, or the shipowner's default prevented the work of loading or discharging being done. Thus the shipowner will be entitled to the agreed demurrage, and to reasonable damages for detention of the ship beyond the days of demurrage, notwithstanding the delay be occasioned by the crowded state of the docks, the state of the weather, the merchant's inability to procure landing papers sooner, the nonarrival or nonproduction of the bill of lading, or the necessity of suspending the discharge of the cargo in order to take in ballast—in fact whenever the detention is not attributable to the default of the shipowner."

In Rumball v. Puig (D. C.) 34 Fed. 665; the charterer agreed to pay "for any detention of the vessel by his default"—a phrase similar to the one in the charters herein involved. The charterer in that case delayed the ship by his failure to furnish the master certain documents which were necessary to clear and sail. The charter said nothing in regard to furnishing papers and documents. Judge Addison Brown in his opinion said:

"It cannot be doubted, however, that it was the charterer's duty to furnish these papers. The 15 lay days were for the purpose of loading. But the general clause giving demurrage was designed, I think, to bind the charterer for the neglect of any duty required of him to enable the vessel to sail."

He therefore held the charterer in default "for not furnishing the ship's necessary documents on Saturday."

In Snow v. 350 Tons of Mahogany and Cedar (D. C.) 46 Fed. 129, the vessel was loaded within the lay days, but the master could not clear, because the charterers had not paid the proper export duty. It was held that the vessel was in no way responsible for this, and that the detention was by the charterer's default, within the terms of the charter contract. In The Cataluna (D. C.) 262 Fed. 212, the charterer failed to get an export license and other clearance papers, with the result that the vessel was delayed for nearly three months, and finally had to discharge the cargo. The charterer was held liable for the delay, as well as for the nonperformance of the charter. As it was the charterers' duty in the instant cases to obtain the licenses, the failure to do so is a default upon their part, and the liability for the resulting detention rests upon them, and not upon the shipowners.

It seems to us, as it did to the court in Grant v. Coverdale, L. R. 9 App. Cas. 470, quite unreasonable to think that the shipowner contracted that his ship might be detained for an unlimited period on account of impediments to those things with which he himself had nothing whatever to do, but which belonged exclusively to the charterer to perform.

[5] Counsel for the respondents attach great importance to what was said by Bowen, L. J., in The Moorcock, L. R. 14 P. D. 68. In that case a shipowner sued a wharfinger to recover damages sustained by his ship in grounding while lying moored at his wharf, when the water ebbed and the vessel settled on a ridge of hard ground beneath the mud. The question was whether, when a contract is made to let the use of a jetty to a ship, which can only use it as both parties knew by taking the ground, there is any implied warranty on the part of the owner of the jetty, and, if so, what is the extent of the warranty. The defendants were held liable on the theory that they impliedly rep-

resented that they had taken reasonable care to ascertain that the bottom of the river adjoining the jetty was in such a condition as not to cause injury to the vessel. In the course of his opinion Bowen, L. J., discussing implied warranty, said:

"Now, an implied warranty, or, as it is called, a covenant in law as distinguished from an express contract or express warranty really is in all cases founded on the presumed intention of the parties and upon reason. The implication, which the law draws from what must obviously have been the intention of the parties, the law draws with the object of giving efficacy to the transaction and preventing such a failure of consideration as cannot have been within the contemplation of either side; and I believe if one were to take all the cases, and they are many, of implied warranties, or covenants in law, it will be found that in all of them the law is raising an implication from the presumed intention of the parties with the object of giving to the transaction such efficacy as both parties must have intended that at all events it should have. In business transactions such as this, what the law desires to effect by the implication is to give such business efficacy to the transaction as must have been intended at all events by both parties who are business men; not to impose on one side all the perils of the transaction, or to emancipate one side from all the chances of failure, but to make each party promise in law as much, at all events, as it must have been in the contemplation of both parties that he should be responsible for in respect of those perils or chances."

We do not question the above statement as to implied warranties, but are unable to see that it has any application to the facts herein involved. The doctrine of implied warranty is founded on the presumed intention of the parties and upon reason, and it is drawn to prevent such a failure of consideration as cannot have been within the contemplation of either side. The charters herein involved were not agreements for the carriage of coal to any particular consignee. All that was agreed upon was that the ships should carry certain cargoes and that the charterers would furnish those cargoes. The charters had no reference to the identity of the consignees. So far as the agreements between the charterers and the shipowner are concerned, the former were at liberty to name any consignee they liked. It is therefore absolutely impossible to infer that it must have been within the contemplation of both parties to these charters that, if the charterers were unable to obtain a license to ship a cargo to a particular consignee objectionable to the government, and who had never been so much as mentioned to the shipowners in any of the negotiations which led to the signing of the charter party, the charterers should be relieved of all liability under the agreement.

Our attention has been called to Texas Co. v. Hogarth Shipping Co., Ltd., 256 U. S. 619, 41 Sup. Ct. 612, 65 L. Ed. 1123. That case went to the Supreme Court from this court, where it was affirmed. It was decided in that case that, where a vessel was taken by the owner's government for war use without the owner's procurement or consent, the performance of a charter for a voyage by that particular vessel was rendered legally impossible, so that the owner was not liable in damages for failure to furnish the vessel for the voyage. There is nothing, as it seems to us, in that case which is applicable to the cases now before the court. The government did not requisition either the Clyde or the Marpesia. There is a wide difference between the requisi-

tion of a vessel and a refusal to allow her to carry coal in time of war to a particular consignee suspected of connections with an alien enemy. The act of the government in Hogarth Shipping Company Case made the performance of the charter party impossible. It operated directly on the ship, and the parties could not avoid it. In the instant cases it was within the power of the parties to send the ship to Argentina by changing the consignee, a change they would not consent to make.

Attention is also called to International Paper Co. v. The Gracie D. Chambers, 248 U. S. 387, 39 Sup. Ct. 149, 63 L. Ed. 318. That case also went to the Supreme Court from this court, which affirmed it. Sailing had been delayed indefinitely by the government's refusal to clear sailing vessels destined for the war zone which went into effect after the shipment commenced. The bill of lading contained the following provisions:

Restraints of princes and rulers excepted. Freight for the said goods to he prepaid in full without discount retained and irrevocably ship and/or cargo lost or not lost."

It was held that the carrier was relieved of the duty to transport the goods and need not refund the prepaid freight.

In Anglo-Russian Merchant Traders v. John Batt & Company, [1917] 2 K. B. 679, a contract for the sale of 50 tons of aluminium had been made in London, to be shipped to a designated foreign port at a specified time. At the date of the contract there was to the knowledge of both parties a prohibition against the export of aluminium from the United Kingdom, except on license granted by the British government. A license was applied for and refused, and on and after December 7, 1915, the shipment of aluminium was absolutely prohibited; so that before there was any default the performance of the contract became illegal. The above case was not between the charterers of a ship and the shipowners. It was between the sellers of aluminium and the buyers, the latter suing because of the failure to ship or deliver the aluminium as contracted for, and Lord Chief Justice Reading held that the sellers' obligation under the contract was to ship during December, 1915, or January, 1916, and that they were entitled to the whole of that time to perform the contract. They were not in default on December 7, when the government prohibited such shipments. It is, however, important to note that, in commenting on a contract note, which stated "sold to" the buyer a certain amount of aluminium, "to be shipped by steamers to Vladivostok during December/or January next," the Lord Chief Justice said:

"The buyers contend that the implied obligation is that the sellers will obtain a license to ship, and that if they do not they will pay damages; that is to say, that the obligation to ship is absolute. In my opinion, if it were an absolute obligation, it would be contrary to the law of England which governs this case. There was at the time of making the contract, and at all material times, a prohibition against the export of aluminium, except under a license. If a license cannot be obtained, aluminium cannot be shipped; and I cannot see why the law should imply an absolute obligation to do that which the law forbids. A shipment contrary to the prohibition would be illegal, and an absolute obligation to ship could not be enforced. I cannot agree

that, in order to give to the contract the business efficacy, it is a necessary implication that the sellers undertook an absolute obligation to ship, whether a license was or was not obtained. A party to a contract may warrant that he will obtain a license, but no such term can be implied in this case. The reasonable view of the contract, in my opinion, having regard to the statement in The Moorecock, is that the sellers sold subject to their being able to ship under a license, and that they impliedly undertook to use their best endeavors to obtain a license. The umpire has found that they used their best endeavors, the failure to ship being due to their inability to obtain a license, and therefore there has been no breach of contract."

In all three of the cases last commented upon the entire performance of the contract was absolutely and for an indefinite future period rendered impossible by governmental action. But in the cases now before the court the performance of the charters was never forbidden. All that the government did in these cases was to refuse to license a shipment to a particular person in the case of the Clyde, and to delay the issue of a license in the case of the Marpesia.

[6] In the Marpesia Case the respondents pleaded the cesser clause, and claimed that whatever rights the Marpesia had, if she had any, had been forfeited because of her failure to exert a lien at Buenos Aires against her cargo for the demurrage which accrued at Norfolk. The cesser clause reads as follows:

"Charterer's responsibility, except as to payment of freight, to cease upon signing bills of lading, but the vessel to have an absolute lien on the cargo for all freight, dead freight, demurrage, or average."

The cesser clause does not say, nor does it mean, that the liabilities of the charterer which have accrued prior to the signing of bills of lading are to be extinguished, but only that the charterer is released from such charter obligations as arise after the bills of lading have been signed. Upon principle and authority, such a clause is not to be construed as retroactive, or to cut off and extinguish liabilities already incurred.

In Christofferson v. Hansen, L. R. 7 Q. B. Cas. 509, a similar question was presented, and a like conclusion was reached, both on principle and authority. Lord Chief Justice Cockburn said:

"What is the construction that we ought to put on that stipulation independently of all authority? The language is to a certain extent ambiguous. It may mean that all liability, on the part of the defendant, both as to past breaches and as to possible future breaches, shall be entirely extinguished as soon as the cargo is loaded; or it may mean that, whereas the defendant would be liable for all breaches of the contract, both before and after the loading, as to all that is to be done touching the completion of the contract after the loading the shipowner should look to the foreign principal. Which is the more probable and reasonable construction of the two?"

He proceeded then to show that on principle and authority the cesser clause does not extinguish liabilities already incurred. In the same case, Lush, J., said:

"I think, therefore, that the more reasonable construction to put upon the clause in question is that it was intended that as soon as the cargo was put on board the contract was to be at an end as far as the defendant was concerned, and he was to incur no further responsibility, remaining, however, liable for any breach of his contract that had occurred up to the completion of the loading."

And Mr. Justice Blackburn, in the same case, said:

"If persons wish and intend to get rid of all liability, past as well as future, they can very easily do so by expressing themselves in unambiguous language."

In Dunlop & Sons v. Balfour & Co., L. R. 1 Q. B. D. 507, 512, it was said:

"There is a presumption against an intention by the shipowner that any causes of action accrued before the loading should be released."

And Lord Esher in the same case in the Court of Appeals, 7 Asp. Maritime Law Cases, 185, dismissing the appeal, pointed out that it was reasonable for the charterer to remain liable for his own acts at the loading port, but to substitute the liability of the cargo for the acts of the consignee and probable owner of the cargo at destination, over which acts the charterer would have no control. His conclusion was that "the cesser clause applies only to delay at the port of discharge."

In this country a like conclusion has been reached. Elvers v. W. R. Grace & Co., 244 Fed. 705, 157 C. C. A. 153; Schmidt v. Keyser, 88 Fed. 799, 32 C. C. A. 121.

We are, for the reasons above stated, convinced that it was error to dismiss the libel in the case of the Marpesia, and that the decree should be reversed; and in that case the District Court is directed to enter a decree in favor of the libelant for $21,000 for the detention of the ship for 42 days at $500 per day, together with interest thereon and costs. For the same reasons, we hold that the decree entered in favor of the libelant in the sum of $104,933.09 in the case of the Clyde must be affirmed. It is so ordered.